265 A.2d 429.

WILLIAM JAKOBER *vs.* E. M. LOEW'S CAPITOL THEATRE, INC. *et al.*

MAY 14, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

106

KELLEHER, J. This is a civil action wherein the plaintiff vendee seeks specific performance of an agreement for the sale of real estate. It was heard before a justice of the Superior Court in a jury-waived trial. After judgment was entered in that court denying the plaintiff's prayer for specific performance but ordering the return to him of a thousand dollar deposit, the plaintiff instituted this appeal.

The defendants are E. M. Loew's Capitol Theatre, Inc., a Rhode Island corporation, and Elias M. Loew, a resident of Massachusetts. Loew is the principal officer and stockholder of the corporation. The parcel in dispute is located in Providence near the northeasterly corner of Westminster and Franklin Streets. The parcel consists of three lots. In 1957 Loew was the owner of two of the lots while the corporation was the owner of the third lot. On this mentioned lot was situated a five-story masonry building which fronted on Westminster Street. The building was vacant, but at one time it had contained a motion picture theatre, a 30-room hotel and a store. Loew decided to sell this parcel. He listed the property[1] with the real estate offices of Peter Laudati and Son. Thereafter, the Laudati firm placed a For Sale sign on the property and

---

[1]Loew insisted at the trial that he had authorized the real estate agency to sell only the lot and building owned by the corporate defendant. The trial justice rejected this testimony and found that defendant had intended that the brokerage firm sell all three lots.

handled the everyday problems incident to the management and care of the property.

During the summer of 1960, Jakober noticed the Laudati sign on the property. He contacted the broker and began to negotiate for the purchase of the parcel. In October 1960, Jakober offered to buy the property for the sum of $40,000 on the express condition that its zoning calssification be changed from C-2 to C-4. On or about October 7, 1960, Jakober gave Peter Laudati, Jr. a check for $1,000 as a down payment, and in return he received a receipt signed by Laudati describing the real estate. The broker endorsed the check and deposited it in his account, and transmitted the offer to Loew. On December 16, 1960, Loew accepted Jakober's offer and expressed the wish that the matter be expedited as he wished to avoid the payment of the 1961 real estate taxes.

Thereafter, Laudati prepared and the parties signed a contract for the sale and purchase of the three lots. The agreement was dated January 9, 1961, and it provided for the conveyance of the premises on  or before April 9, 1961, by a warranty deed giving the vendee a clear title. The agreement expressly provided that it was made subject to a change in the present zoning.

In February 1961, Jakober was advised by a municipal official that the likelihood of a zoning change was practically nil. Accordingly, on February 10, 1961, Jakober transmitted a new offer to Laudati. He told the real estate agent that he would purchase the land as it was zoned, but that he would pay only $35,000 for the property. This, of course, was $5,000 less than the purchase price set forth in the January 9, 1961 agreement. Laudati forwarded this proposal on to Loew. Loew, by a letter dated February 15, 1961, rejected Jakober's new offer.

Matters remained dormant until April 7, 1961 when Jakober notified Laudati that he would waive the condition

relating to zoning and pay the $40,000, but that he would need an additional 30 days to arrange for the necessary financing. Laudati informed Jakober that he could not give the vendee any extension of time but that he would contact Loew. He wrote to Loew and disclosed Jakober's willingness to complete the deal waiving the zoning change. The agent also relayed Jakober's request for more time. Laudati never received a reply to this letter, written or otherwise, from Loew, and in fact the last written communication received by the realtor relative to any phase of the extended dealings between the vendee and the broker was Loew's letter wherein he rejected Jakober's proposal to reduce the purchase price.

On May 3, 1961, Laudati notified Loew that Jakober was ready to complete the transaction and that the broker would contact the title company during that week. Thereafter, there was a one-way flow of communications—from Laudati to Loew. One of these enclosed a report of the Title Guarantee Company of Rhode Island which raised numerous questions concerning the state of the title to the three lots. Laudati wrote to his employer on May 11, May 26, June 14, July 13, August 16, and September 22, 1961. Loew never answered nor acknowledged the receipt of any of Laudati's letters. At this point, Laudati felt that Loew was not going to sell, and he ceased any and all further efforts to consummate the sale. Jakober continued to call at the Laudati offices from time to time and inquire about the status of the transaction.

On May 25, 1962, Jakober's attorney wrote to Loew and inquired as to when the vendor would convey the parcel to his client. Loew, in a letter dated June 1, 1962, advised the attorney that he considered the sales agreement terminated when Jakober submitted his offer of $35,000. This suit was begun in September 1962.

The evidence shows that Jakober never had any per-

sonal contact with Loew. All his dealings were with Laudati. The first time the litigants saw each other was in the courtroom.

While this action was pending, the subject real estate was taken by the Providence Redevelopment Agency under its eminent domain power as part of its Weybosset Hill Project. There is in the record evidence that, at or around the time that Jakober and Loew executed their sales agreement, both parties were aware of the possibility that the parcel would be the subject of condemnation proceedings.[2]

The single issue in this appeal is whether the trial justice erred when he ruled that Jakober had abandoned the sales agreement dated January 9, 1961. We affirm the trial court's finding.

In holding that Jakober had abandoned the January 1961 sales contract, the trial justice pointed to the vendee's February offer and to his conduct from that time until two days before the expiration of the 90-day period set forth in the agreement. The trial court remarked in its decision that, from the time of Jakober's new offer until the moment of his last minute request for more time, Jakober had done nothing which would indicate a willingness on his part to waive the zoning change provision and abide by the other terms of the original sales agreement. The trial judge in making these observations emphasized that Jakober during this period never sought to have the title to this property examined. Having once abandoned the contract, the court below ruled that Jakober could not revive the January agreement.

Jakober concedes that when a case is submitted to a

---

[2]Jakober's claim is not defeated by the condemnation. If the sales agreement was valid and outstanding at the time of the taking, Jakober would have been entitled to receive the market value of the property as of the date of condemnation subject to his obligation to pay the agreed purchase price. *Salvatore* v. *Fuscellaro*, 53 R. I. 271, 166 A. 26.

trial justice sitting without a jury the findings of fact will be afforded great weight and will not be set aside on appeal unless an appellant can show that the trial justice either misconceived or overlooked material evidence or that he was clearly wrong. He contends with great vigor that the Superior Court misconceived the pertinent evidence and erred in applying the law to the facts of this case.

Although we are not persuaded that the trial court erred in its consideration of either the evidence or the law, we shall briefly review the law of abandonment as it relates to a contract for the sale of real estate.

The vendee in an executory contract for the sale of land becomes the equitable owner of the same, the vendor holding legal title merely as security for the purchase price. *Salvatore* v. *Fuscellaro, supra.* However, when the vendee abandons the sales contract, his equitable title is terminated without the necessity of any further transfer. 8A Thompson, *Law of Real Property* §4447, at 279 (1963 ed.). Generally speaking, abandonment is the voluntary relinquishment of a known right. *Doris* v. *Heroux,* 71 R. I. 491, 47 A.2d 633. Whether the vendee's equitable title has been extinguished by abandonment depends upon the concurrence of two factors—an intent to abandon together with some act or failure to act which warrants the conclusion that the vendee no longer claims or retains any interest in the subject matter. *Merryman* v. *Bremmer,* 250 Md. 1, 241 A.2d 558. Once the intention to abandon is united with conduct demonstrative of a relinquishment of rights in the contract, the abandonment is complete. The requisite intent may be inferred from one's conduct. *Melco Investment Co.* v. *Gapp,* 259 Minn. 82, 105 N.W.2d 907. Aban-

donment is entirely unilateral[3]—it requires action only by the possessor of the right, title or interest which is to be abandoned. The attitude of the other party to the contract is immaterial. *Mason* v. *Hasso,* 90 Ariz. 126, 367 P.2d 1; *Hull* v. *Clemens,* 200 Ore. 533, 267 P.2d 225. Finally, whether there has been an abandonment of a contract is a question of fact. *Collins* v. *Collins,* 348 Mich. 320, 83 N.W.2d 213.

Jakober argues that as a matter of law his abandonment cannot become operative unless and until the vendor elects to treat the contract as having been abandoned. In taking this position, he refers us to *Lang* v. *Todd,* 148 Neb. 726, 28 N.W.2d 434. We have read this case and must concede that there is some language contained therein which might be regarded as giving support to plaintiff's contention. We must, however, disagree with that portion of the opinion in *Lang* which could be considered to hold that, unless the vendor accepts the vendee's abandonment, the vendee is free to complete the contract just as if he had not repudiated the agreement.

In 2 Black, *Rescission of Contracts* (2d ed.) §532, at 1306-1307, the author points out that, where a party distinctly and completely abandons all rights and obligations under a contract, the other party may assent to such an abandonment and thereby effect a rescission of the contract; or he may refuse to accept the abandonment and sue for damages because of the other party's repudiation; or he can await for the time of performance and hold the other party responsible for all the consequences of his nonperformance including a bill for specific performance. In *Doo-*

---

[3]In *Ellis* v. *Swan,* 38 R. I. 534, 96 A. 840, this court in speaking of an abandonment of a lease by a lessee said that there could not be an abandonment of a lease without the acquiescence of the lessor. Upon reflection, we feel the court's language was imprecise. A study of the cases cited in this portion of the opinion makes it clear that the court was speaking of a *surrender* rather than an abandonment of a lease.

*ley* v. *Stillson,* 46 R. I. 332, 128 A. 217, we declared that rescission is something more than the termination of a contractual obligation. It seeks to create a situation as if no contract existed. We said in *Dooley* that rescission differs from a breach of a contract by abandonment or repudiation in that to have a rescission there must be a mutuality expressed or implied. Likewise, rescission is defined in 5A Corbin, *Contracts,* §1236, at 533, as a mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder.

Accordingly, Jakober's theory of abandonment is faulty because, if one of the contracting parties assents to the abandonment of the contract by the other party, there has been a rescission of the contract. Both parties are then restored to the status they occupied prior to the contract, and neither can sue the other on the contract. The plaintiff's difficulty comes from his failure to distinguish between an abandonment and a rescission of a contract. Abandonment, as we said before, is a unilateral act. Rescission is a bilateral action.

We believe that the brief and concise summary of the law which is applicable to the case at bar can be found in *Graves* v. *White,* 87 N. Y. 463, at 465, where the Court of Appeals said:

> "* * * the refusal of one party to perform his contract amounts on his part to an abandonment of it. The other party thereupon has a choice of remedies. He may stand upon his contract, refusing assent to his adversary's attempt to rescind it, and sue for a breach, or in a proper case, for a specific performance, or he may assent to its abandonment, and so effect a dissolution of the contract by the mutual and concurring assent of both parties. In that event he is simply restored to his original position, and can neither sue for a breach or compel a specific performance, because the contract itself has been dissolved."

In seeking to overturn the Superior Court's conclusion

that his actions amounted to an abandonment, Jakober states that, contrary to the trial court's assertion, once the sales agreement was signed, he ordered a title search. In making this contention, Jakober points to the testimony of Peter Laudati, Jr. Laudati told the court that he did file an application in Jakober's name with the Title Guarantee Company of Rhode Island for a title examination. Laudati could not tell when this application was filed, and he was not certain if he ever told Jakober that he had filed the application. The report rendered by Title Guarantee was dated May 10, 1961—just about a month after the deadline set forth in the sales agreement. It was sent to Laudati, not to Jakober.

It is undisputed that, once the sales contract was signed, Jakober never made a formal application to any of the established title companies in this state seeking a search of the title of the subject property. Although Jakober did testify that he spoke informally about his proposed purchase with a friend who was counsel for another title company, he could not recall when the conversation took place. He conceded that no written report from his friend's company was ever received or requested by him prior to April 9, 1961.

The plaintiff apparently ignores his behavior during the period of time after he made his new offer of $35,000 until the day he asked Laudati to see if he could persuade Loew to extend the time for his performance. Jakober's conduct during this almost-two-month period was crucial to the trial justice's finding. It is obvious from a reading of his decision that the trial judge found that, once Jakober had offered the $35,000, he did nothing but wait for Loew to capitulate to his terms. He failed to institute a title search, nor did he make any effort to secure the necessary financing. Although Jakober has alleged that he would experience no difficulty in raising the $40,000, it is

114

undisputed that just two days before the April 9, 1961 deadline he was asking for more time so that he could marshall his assets. The record clearly refutes plaintiff's contention that during the three months between January 9 to April 9, 1961, he was actively seeking to consummate the sale of the Loew property.

Ordinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that a breach of the time element will excuse nonperformance. *Safeway System, Inc.* v. *Manuel Bros.*, 102 R. I. 136, 228 A.2d 851; *Sal's Furniture Co.* v. *Peterson*, 86 R. I. 203, 133 A.2d 770. However, this principle does not mean that a party can be completely oblivious to a stipulation in a contract relating to time, but it assumes that a party to a contract will proceed in good faith towards the completion of his undertaking. A person cannot neglect the contractural provision of an agreement to suit his own convenience or profit.

We are concerned in this case with a complaint which seeks specific performance. The grant of such relief is not a matter of right, but rests in the sound discretion of the trial justice. It is well established that the party who wishes to avail himself of the unique remedy of specific performance must show that he was ready, able and willing to perform his part of the contract.

It is apparent from the record that Jakober made no effort to be ready, able and willing as of April 9, 1961. While he testified at great length as to his desire to purchase the Loew parcel, Jakober offered no reasonable justification for his failure to proceed in a reasonable manner to be ready by the last day of the agreement. The diligence required of a plaintiff in a suit for specific performance was lacking in this case as was any genuine explanation for Jakober's complete inertia.

Additionally, the actions of Jakober must be viewed with

special care because the contractural obligations arising from the sales agreement were essentially all on the vendor's side. If the property was not rezoned, Jakober had an escape hatch which would permit him to walk away from the contract. It would be unreasonable to hold that a party who alone is fully committed to a contract should be bound thereto interminably. Accordingly, in such circumstances as are presented in the sales agreement before us, the specific time limits are more meaningful than in those situations where the obligations are bilaterally firm. *Stamato* v. *Agamie*, 24 N. J. 309, 131 A.2d 745.

It is our belief that there is evidence to justify the trial court's finding that Jakober had abandoned the sales contract prior to April 9, 1961. Jakober is not a novice in the real estate business. He had informed the trial judge that he had spent the last 20 years in the buying and selling of property, particularly commercial property. Jakober's inaction belied the allegations contained in his complaint that once the January 9, 1961 agreement was signed, he was ever ready to perform his obligations thereunder.

We cannot shut our eyes to the fact that Jakober was aware in the spring of 1961 that the Loew property would be taken for redevelopment purposes. This fact undoubtedly accounted for his efforts to revive the transaction once abandoned. Accordingly, we think that the following portion of *Eastman* v. *Plumer*, 46 N. H. 464 is pertinent:

> "Those who desire to secure the aid of equity in enforcing the performance of contracts, must show themselves prompt, ready and eager to perform them and abide by them. So, when either party to a contract of sale fails or refuses to claim or act under the contract, for such a length of time as to give the impression that he has waived or abandoned the sale or purchase, *and more especially when the circumstances justify the belief that his intention was to perform the contract only in case it suited his interest, he will*

> *necessarily forfeit all claim to equity."* (Italics ours.) *Id.* at 479.

As this court held in *Barden* v. *Sarkin,* 73 R. I. 170, 53 A.2d 913, where the purchaser delays his performance in order that he can determine whether it will be to his advantage to have the benefit of the contract, the purchaser cannot invoke the equitable assistance of the doctrine of specific performance.

The plaintiff's appeal is denied and dismissed.

*Letts & Quinn, Andrew P. Quinn, Alan S. Flink,* for plaintiff.

*Higgins, Cavanagh & Cooney, John P. Cooney, Jr.,* for defendants.