John G. KOTTIS et al.

v.

Benedetto A. CERILLI, Jr., et al.

No. 90–502–Appeal.

Supreme Court of Rhode Island.

July 7, 1992.

Robert Fine, Licht & Semonoff, Providence, for plaintiff.

Milton Stanzler, Lauren E. Jones, Providence, for defendant.

## OPINION

SHEA, Justice.

This case comes before the Supreme Court on the defendant's appeal from a judgment in Superior Court awarding the plaintiffs $1,872,999.42 plus additional interest, costs, and attorney fees for a claim of breach of contract. We affirm.

The plaintiffs are John G. Kottis (Kottis), William J. McManus (McManus), Harry B. Casey (Casey), and Paul E. Burke (Burke). These four individuals own half the shares of Camelot Gardens, Inc. (Camelot). Camelot was formed to own real estate known as the Hammersmith Farm in Newport, Rhode Island.[1] Camelot operated a museum on this property. Benedetto A. Cerilli, Jr. (Cerilli), represented the interest of Thomas DeFelice (DeFelice), the defendant and prospective purchaser of the property. DeFelice negotiated with plaintiffs and eventually signed a purchase-and-sale agreement on December 11, 1979, to buy their stock in Camelot for the total sum of $1,360,000 or $340,000 per shareholder. The defendant paid plaintiffs a $12,000 deposit upon the signing of the purchase-and-sale agreement. A closing was scheduled for December 28, 1979. On that date the closing did not occur.

The plaintiffs eventually filed suit, alleging that defendant breached the December 11, 1979 purchase-and-sale agreement. At trial the trial justice granted defendant's motion for a directed verdict. That judgment was appealed to this court, and in *Kottis v. Cerilli*, 526 A.2d 506 (R.I.1987), we determined that the motion for directed verdict was improperly granted on one of the counts alleged and we therefore granted a new trial. The present case comes before us on an appeal from the judgment rendered in that new trial.

The defendant raises seven issues on appeal. Pertinent facts will be added as is necessary for a discussion of these issues.

### I

The first issue that defendant raises is whether plaintiffs' tender of performance at the December 28, 1979 closing was sufficient to support an award for breach of contract against defendant. Specifically defendant asserts that plaintiffs did not have the actual ability to perform their end of the bargain because plaintiffs could not transfer all the shares of stock they had agreed to deliver, the Camelot corporate records were incomplete, and Camelot's financial statements were improperly prepared. Moreover, defendant argues, plaintiffs actually could not perform their part of the bargain because Camelot did not have marketable title to Hammersmith Farm because of a lis pendens that was recorded against the real estate, Camelot could not establish that they had met the requirements of the corporation's preemptive right to purchase the stock, and plaintiffs did not produce copies of schedules that they were required to deliver at the closing.

It has long been established that when concurrent acts are to be performed by the parties to a contract, the party bringing suit for breach need only aver that he or she was ready and willing to perform and that the alleged breacher was requested to

---

1. Hammersmith Farm, a large tract of land with a water view, is a well-known Newport property because it was used as the Summer White House during the Kennedy administration.

perform but refused. *Kottis,* 526 A.2d at 509; *Nowell v. Waterman,* 53 R.I. 16, 19, 163 A. 402, 404 (1932); *Guilford v. Mason,* 22 R.I. 422, 430, 48 A. 386, 389 (1901). When the party alleging the breach demands the other's performance of the concurrent act, an offer to perform on the part of the alleging party is implied and understood. *Kottis,* 526 A.2d at 509; *Guilford,* 22 R.I. at 430, 48 A. at 389. Actual performance by the party alleging the breach is not necessary; rather, notice of his or her readiness to perform constitutes and implies tender. *Kottis,* 526 A.2d at 509; *Guilford,* 22 R.I. at 428, 48 A. at 388; *see Safeway System, Inc. v. Manuel Bros., Inc.,* 102 R.I. 136, 143, 228 A.2d 851, 855 (1967); *Fournier v. Cass,* 49 R.I. 35, 39, 139 A. 655, 656 (1927).

■ These rules clearly delineate that parties alleging breach are not required to perform their part of the bargain before suing other parties for breach. The party alleging breach is only required to tender performance. Tender of performance occurs by providing notice to the other party that one is ready to perform. Williston succinctly summarized the preceding rules by stating that:

"what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary." 6 S. Williston, *Contracts* § 833 at 104 (3d ed. Jaegar 1962).

■ In the present case, plaintiffs properly pleaded in their complaint that they were ready and willing to perform and that defendant refused to perform. Moreover, a review of the trial record indicates that plaintiffs attended the closing, intending to sell their stock. McManus testified that he and Kottis arrived promptly for the closing and brought a briefcase containing documents they were required to supply for the closing. Thus plaintiffs represented to defendant that they were ready to close and, most importantly, that they had the ability to close. Indeed, the trial justice found that "plaintiffs met their obligations for tender, they were ready to perform." We agree with the trial justice, and moreover, we find that plaintiffs' act constitutes a sufficient tender of performance and therefore can support plaintiffs' claim for contract damages.

Since we have determined that plaintiffs were ready to close on the date of the closing, defendant's fact-specific arguments asserting actual inability to close are unavailing and therefore do not merit further discussion.

## II

The second issue that defendant argues is whether the trial justice erroneously failed to consider DeFelice's claim that the December 11, 1979 contract was unenforceable. The defendant asserts that plaintiffs had reached an accord and satisfaction with DeFelice or that plaintiffs had abandoned the contract. Moreover, defendant contends that the trial justice's failure to comment on these issues when issuing her decision violated Rule 52(a) of the Superior Court Rules of Civil Procedure.

After the closing did not occur on December 28, 1979, the parties continued to negotiate, hoping that the deal could be restructured. A meeting on February 27, 1980, produced another agreement. One issue the parties haggled over at that time was whether the $12,000 deposit should be returned. The defendant contends that he permitted plaintiffs to keep the deposit in exchange for plaintiffs' agreement that the December 11, 1979 agreement was no longer effective.

■ An accord and satisfaction is "[a]n agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions." *Cavanagh v. Bostitch, Inc.,* 92 R.I. 12, 14, 165 A.2d 728, 729 (1960)(quoting Bouvier's Law Dictionary 103 (1914)).

Thus, in order for the doctrine of accord and satisfaction to operate as a defense, the party asserting the defense must show that an agreement exists and that the agreement was accepted in exchange for refusal to press a right of action.

■ In the present case, the parties did agree that plaintiffs could keep the $12,000 deposit defendant gave them as a deposit for the December 11, 1979 agreement. Nevertheless, the record does not reveal any evidence that would support the contention that defendant allowed plaintiffs to keep the deposit in exchange for plaintiffs' relinquishment of their right to enforce the December 11, 1979 agreement. Rather the testimony presented at trial indicates that defendant permitted plaintiffs to keep the money because he did not want this dispute to impair the possibility of reaching a new agreement. The plaintiffs did not keep the money in exchange for refusing to sue defendant on the December 11, 1979 agreement. Thus, the requirements for an accord and satisfaction are not met.

■ The rules for the doctrine of abandonment are well established. Generally abandonment is the voluntary relinquishment of a known right. *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 110, 265 A.2d 429, 433 (1970). Abandonment of an executory contract for the sale of land requires an intent to abandon and some act or failure to act that shows that vendee no longer claims or retains any interest in the subject matter. *Id.* Moreover, abandonment is unilateral, requiring action only by the possessor of the right that is to be abandoned. *Id.* at 110–11, 265 A.2d at 433.

■ We are of the opinion that plaintiffs did not abandon the contract in the present case. The defendant relinquished his right to the return of the $12,000 because he feared that if he pressed his claim for the money, a new deal would not be consummated. Thus, he did not have an intent to abandon the December 11, 1979 contract but rather merely intended to do everything in his power to keep the negotiations going. Moreover, defendant's continued negotiation with plaintiffs supports the contention that defendant retained an interest in Hammersmith Farm pursuant to the December 11, 1979 contract. Therefore, the requirements for an abandonment are not met.

■ Finally defendant's contention that the trial justice violated Rule 52(a) by not specifically addressing defendant's assertions about accord and satisfaction and abandonment in her decision is without merit. Rule 52(a) provides, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." We have stated that in order to comply with the rule, "the trial justice * * * need only make specific findings on factual issues relevant to the controlling legal questions which are endemic to the contested issues." *Shoor–Elias Glass Co. v. Raymond Construction Co.*, 114 R.I. 714, 716, 339 A.2d 250, 252 (1975). Furthermore, we have also stated that "we will not in every instance insist upon strict compliance with the factfinding requirements of [R]ule 52(a)." *Rowell v. Kaplan*, 103 R.I. 60, 70, 235 A.2d 91, 97 (1967).

In the present case a review of the trial justice's decision reveals that the trial justice adequately set out the facts necessary to reveal how she reached her legal conclusions. Rule 52(a) does not require the trial justice to set forth all facts presented at trial. The rule also does not require the trial justice to explain why each legal result asserted by a party was not accepted by the court. Here, the court determined that a breach of the December 11, 1979 agreement occurred. By implication this determination results in rejection of defendant's contention that an accord and satisfaction or an abandonment had occurred. The trial justice did not violate Rule 52(a) by not discussing these issues.

### III

Next defendant argues that the trial justice erroneously held that plaintiffs proper-

ly mitigated their damages. The defendant argues that the stock of Camelot that was to be purchased pursuant to the December 11, 1979 agreement is a good within the meaning of the Uniform Commercial Code. Therefore, defendant claims that he was entitled to notice of plaintiffs' intention to sell the stock as required by G.L.1956 (1969 Reenactment) § 6A–2–706(3). The defendant asserts that plaintiffs failure to give notice of their intention to sell as required by § 6A–2–706(3) deprived plaintiffs of their claim for the difference between the contract price and the price for which they sold the stock. The defendant also argues that the December 11, 1979 agreement was intended to be a secured transaction and that thus he was entitled to notice of the sale of the stock pursuant to G.L.1956 (1969 Reenactment) § 6A–9–504(3), as amended by P.L.1979, ch. 172, § 4.

In March of 1980 it became apparent that the transaction between plaintiffs and defendant was not going to go forward. Five of the shareholders requested a special meeting of the board of directors of Camelot at this time. Three plaintiffs in this case—Casey, Kottis, and Burke—thought this notice was a precursor to an attempt to oust them as directors. They then brought a civil action against the other shareholders, claiming that their attempted ouster was a violation of the corporate bylaws. At a hearing for a temporary restraining order on this lawsuit, the parties decided that the disagreement among the shareholders could best be resolved by having the corporation redeem the shares of stock owned by Casey, Kottis, and Burke for $162,500 each. Casey, Kottis, and Burke then agreed to drop their lawsuit. McManus, also agreeing to sell his Camelot stock, sold it to two remaining shareholders for $140,000. Naturally, in their suit plaintiffs claim their damages are the difference between the contract price of $340,000 per shareholder and the amount for which they sold their shares back to the corporation. The essence of defendant's argument is that because he did not have notice of this sale, he could not offer to purchase the stock or find buyers that could pay more

than the amount for which plaintiffs sold the stock back to the corporation.

Paragraph 10 of the December 11, 1979 purchase-and-sale agreement states:

"The Buyer agrees to sign a Pledge Agreement of the Stock in Camelot Gardens, Inc. transferred herein to him pledging the Stock to the Sellers who will maintain possession of said Stock. This Pledge of Stock shall be held by the Seller from the date of sale to the date of final installment, if paid."

The defendant relies on this clause to show that a chapter 9 of title 6A security interest was created in the purchase and sale agreement.

It is undisputed that Camelot is a closely held corporation. Thus the issue before us is whether the stock of a closely held corporation is a "good" within the Uniform Commercial Code (UCC). The U.C.C. "applies to transactions in goods." Section 6A–2–102. Goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities * * * and things in action." Section 6A–2–105(1). We are of the opinion that stock of a closely held corporation does not meet any of these definitions of goods.

█ First the stock of a closely held corporation is not a "thing" that is movable at the time of identification to the contract. "Thing" in this context should be interpreted to apply to tangible goods that are exchanged in the flow of commerce. A determination that stock of a closely held corporation was a thing according to § 6A–2–105 would pervert the intent of this section, which is to ensure the uniform exchange of goods. The exchange of stocks, even stock in a closely held corporation, is governed by other rules.

█ Second, the stock of Camelot does not meet the U.C.C. definition for securities. The code, at the time the purchase and sale agreement was signed, stated that a

"(a) A 'security' is an instrument which

(i) is issued in bearer or registered form; and

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms divisible into a class or series of instruments; and

(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer." Section 6A–8–102(1)(a), as amended by P.L.1973, ch. 270 § 1.

The stock of Camelot does not meet all the requirements of § 6A–8–102(1)(a). The stock of Camelot is represented by an instrument issued in registered form, namely, the stock certificates, and is one of a class that is divisible into shares. Furthermore, the stock of Camelot does comprise a share of an enterprise, specifically Camelot Gardens, Inc.

The second part, however, requiring the stock to be traded on a securities exchange or recognized as a medium for investment, is not fulfilled by the Camelot stock. Clearly the stock of this closely held corporation is not traded on a securities exchange or market. Moreover, the Camelot shares are not a medium for investment because there is no ready market for the shares or a means for determining their value. Thus, the Camelot stock shares are not "securities" for purposes of § 6A–8–102(1)(a).

■ Moreover, we are not persuaded that the Camelot stock can be classified as a thing in action, also commonly known as a chose in action. A chose in action can be defined as "a right of bringing an action or right to recover a debt or money." Black's Law Dictionary 241 (West 6th ed.1990). We are of the opinion that the Camelot stock does not meet this definition. Holding stock in a closely held corporation does not empower the holder with a right to bring an action. A right to sue may be incident to possession of the stock, but mere possession does not create that right. Moreover, ownership of stock does not cre-ate a debtor-creditor relationship between the stockholder and the corporation. The stockholder does not have a right to be repaid his or her investment by the corporation. Thus the Camelot stock is not a chose in action, and therefore, it is not a good for purposes of § 6A–2–102.

■ Section 6A–9–102(2), as amended by P.L.1979, ch. 172, § 4, provides that "[t]his chapter applies to security interests created by contract including pledge * * * ." Paragraph 10 of the December 11, 1979 purchase-and-sale agreement requires the buyer to pledge the stock of Camelot to the sellers as security for the buyer's obligation to pay. Since the closing never occurred, the buyer did not sign the pledge agreement, and thus the pledge never was executed. Therefore, the requirements of § 6A–9–102(2) are not met, and a chapter 9 of title 6A security interest was never created.

## IV

■ The next issue that defendant asserts is that the trial justice overlooked or misconceived the evidence when making factual findings. Specifically, defendant argues that the evidence does not demonstrate that the parties reached an agreement on the price and payment terms of the December 11, 1979 agreement. Moreover, defendant contends that the trial justice improperly determined that the reason for the failure to close on December 28, 1979, was DeFelice's lack of funds.

It is well established that findings of a trial justice sitting without a jury will not be disturbed unless it is demonstrated that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Smith v. Boyd*, 553 A.2d 131, 134 (R.I.1989); *Miller v. Dixon Industries Corp.*, 513 A.2d 597, 601 (R.I.1986); *Dickinson v. Killheffer*, 497 A.2d 307, 312 (R.I. 1985). Thus our task is to determine if the trial justice overlooked or misconceived material evidence regarding whether the parties reached an agreement on price and payment terms and whether the failure to

close on December 28, 1979 was due to DeFelice's lack of funds.

In regard to the agreement on price and payment terms, a review of the trial record indicates that the trial justice did not overlook or misconceive any material evidence. The record clearly reflects that the written agreement signed by both parties contained a sales price of $340,000 per shareholder. The well-accepted applicable rule is "that a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I.1981). Since defendant signed the written agreement and the law regards a signature on such a document as manifesting the signer's intent, the trial justice's determination that price and payment terms were included in the agreement is not erroneous.

Furthermore, defendant's contention that the trial justice improperly determined that DeFelice's lack of funds caused the failure to close on December 28, 1979, is without merit. As previously discussed in the first section of this opinion, plaintiffs fulfilled their obligation at the closing by arriving and tendering the documents that were necessary for the closing. DeFelice then failed to tender payment. The trial justice properly evaluated the evidence, and her decision was correct.

## V

Next, defendant argues that the trial justice erroneously calculated damages. First, defendant asserts that the trial justice failed to reduce plaintiffs' damages by a total of $12,000, the amount that DeFelice had paid as a deposit on the contract. Second, defendant contends that the trial justice failed to consider an option in the purchase-and-sale agreement that would have allowed DeFelice to purchase all the stock owned by the four plaintiffs for $640,000. At trial the trial justice determined that the total purchase price was $1,360,000 and awarded each plaintiff damages of $177,500, which is the difference between $340,000, the contract price per

share, and $162,500, the amount per share for which plaintiffs redeemed their stock to the corporation.

A review of the trial record indicates that the trial justice considered all the evidence presented when determining the amount of contract damages to award to plaintiffs. Our deferential review of the finding of the trial justice sitting without a jury, combined with our determination that the trial justice considered all the evidence presented concerning damages, leads us to conclude that the trial justice did not err in calculating damages.

## VI

The sixth issue that defendant raises is whether the trial justice erroneously interpreted the December 11 agreement by holding that plaintiffs could recover interest on the damages at 20 percent for the period after February 20, 1982, and could recover attorney's fees. Paragraph 12 of the agreement states:

"If upon February 20, 1982, the balance due and payable is not then paid, the Sellers may at their option proceed to enforce their obligations against the buyers and said outstanding balance shall be computed at the rate of twenty (20%) percent per annum, plus necessary attorneys fees for collection."

The defendant contends that this paragraph only applies to payment of the balance due on the promissory note and not to any damages caused by a breach of contract.

When the terms of a contract are construed "unless a plain and unambiguous intent to the contrary is manifested, the words used in the contract are assigned their ordinary meaning." *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 581, 410 A.2d 986, 991 (1980). Stated another way, "clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions." *Elias v. Youngken*, 493 A.2d 158, 163 (R.I.1985) (quoting *Chapman v. Vendresca*, 426 A.2d 262, 264 (R.I.1981)).

In the present case, paragraph 12 of the contract does not define any of its terms or refer to any other parts in the contract. The contract law of Rhode Island therefore requires that we ascertain the ordinary meaning of the words in paragraph 12. It is clear to us that the ordinary meaning of paragraph 12 requires the defendant-buyer to pay 20 percent interest starting on February 20, 1982, if he or she has not paid the balance due on the contract. Of course, when defendant breached his contract with plaintiffs he did not pay the balance due. The ordinary meaning of paragraph 12 leads to the conclusion that its terms cover a breach of contract since paragraph 12 covers instances when the defendant does not pay. Similarly the ordinary meaning of the words in paragraph 12 provides for an award of attorney's fees. Thus, attorney's fees were properly awarded. Therefore, the trial court properly awarded 20 percent interest to plaintiffs for the period after February 20, 1982, and properly awarded attorney's fees necessary to collect this interest.

## VII

■ The defendant's final contention is that the trial justice improperly included expert-witness fees in the amount of costs awarded to plaintiffs. After the written decision of the trial justice was issued plaintiffs filed a motion for award of costs and requested payment of $5,400 for the witness fees of two experts who evaluated the property. The trial court never directly ruled on the motion. Later, the trial court did, however, issue a judgment that awarded plaintiffs "costs." This judgment did not explicitly include witness fees within the award of costs.

General Laws 1956 (1969 Reenactment) § 9–22–5 provides: "In civil actions at law, the party prevailing shall recover costs, except where otherwise specially provided, or as justice may require, in the discretion of the court." Thus the issue before us becomes the question of whether expert-witness fees are costs for purposes of § 9–22–5.

Costs are normally considered the expenses of suing another party, including filing fees and fees to serve process. Fees to pay expert witnesses would not be included in this definition of costs. Moreover, since the trial justice never directly ruled on the plaintiffs' motion for award of costs, we can infer that the trial justice did not intend to exercise the discretion granted to her by § 9–22–5 and have her award of costs include the fees for expert witnesses. Thus, we reject the defendant's contention that the trial justice's judgment awarding costs included expert witness fees. Finally, we note that if such fees had been included as costs, this award would be improper.

For these reasons the defendant's appeal is denied, the judgment of the trial justice is affirmed, and the papers of the case are remanded to the Superior Court.