Gaetano W. **CITRONE** et al.

v.

**SNJ ASSOCIATES** et al.

No. 94–483–Appeal.

Supreme Court of Rhode Island.

Aug. 22, 1996.

Leonard L. Bergersen, Peace Dale, for Plaintiff.

Archibald B. Kenyon, Jr., John Kenyon, Wakefield, for Defendant.

### OPINION

BOURCIER, Justice.

This matter comes before us on the appeal of SNJ Associates (SNJ) and John F. Grunigan (Grunigan), N.R. Tomassetti (Tomassetti), and Stephen Nemecek (Nemecek), as individuals, from a final judgment entered in the Superior Court by a trial justice sitting without a jury.[1] That final judgment granted specific performance and other relief to the plaintiffs, Gaetano W. and Marie V. Citrone (the Citrones), and ordered SNJ to

---

**1.** SNJ represents the first initial in the first names of Nemecek, Tomasseti and Grunigan.

convey waterfront property to the Citrones. We reverse.

## I

### Facts and Travel

In 1982, the Citrones began looking for property to purchase in the South County area in Rhode Island. During the course of their search, they contacted John Seavey (Seavey), a sales agent who at that time worked for Bay Realty, Ltd. (Bay). In 1983, Bay became the exclusive listing agent for a parcel of waterfront property owned by SNJ in North Kingstown on Walmsley Lane, River Road, that included the lot in issue here, lot No. 11. Seavey brought that lot to the Citrones' attention. The Citrones expressed an interest in it, and a purchase and sales agreement was prepared by Bay and executed by the Citrones and the three principals of SNJ—Grunigan, Tomassetti, and Nemecek—on September 22, 1984. The purchase price for the lot was $57,900 and required a deposit of $2,500. The purchase and sale agreement contained three conditions, in addition to the typical financing conditions, that needed to be met prior to June 1, 1985, the date set in the agreement for closing. The first condition was that the Coastal Resources Management Council (CRMC) approve construction of a single family dwelling for lot No. 11 on or before April 15, 1985. The second condition in the agreement was that the seller install electrical service for the lot at the buyer's expense. The third condition was that the buyer apply to CRMC, presumably for construction approval, on or before December 31, 1984, and that a copy of that application be provided to the seller. The agreement was recorded on March 18, 1985.

The Citrones, acting pursuant to the agreement, filed an application for CRMC building approval. That CRMC application was received by CRMC on December 26, 1984. The application included construction plans for the Citrones' proposed home that had been previously approved by the North Kingstown town building inspector, subject to CRMC approval. The Citrones' CRMC application also included an application for an individual sewer disposal system (ISDS).

The ISDS application was approved on September 17, 1985, and reapproved for the years 1986, 1987, 1988, and 1989, but the Citrones' application for approval by CRMC to construct a single family dwelling on lot No. 11 was never approved and, in fact, appears from the record still to be unapproved.

On November 9, 1984, in response to construction preparation activities being performed on Walmsley Lane by SNJ, CRMC issued a cease and desist order for all activities occurring on the Walmsley Lane property owned by SNJ, including lot No. 11. A letter from John A. Lyons (Lyons), the chairman of CRMC, which accompanied the cease and desist order, explained to SNJ that the SNJ property constituted a subdivision of more than six lots, which as a result came under CRMC jurisdiction, pursuant to Coastal Resources Management Program § 320(D). A second letter written by Lyons to SNJ on December 12, 1984, further explained that before any construction activity could take place on its Walmsley Lane property, a formal application from SNJ to subdivide its property had to be submitted to CRMC. A letter from CRMC was later sent to the Citrones on May 2, 1985, explaining that a cease and desist order was in place on lot No. 11 as a result of a subdivision review pursuant to § 320. That letter informed the Citrones that they could not perform any physical construction activities on lot No. 11 until CRMC assent was received. It was later learned that, according to CRMC, the cease and desist order prohibited transfer of the property title until subdivision approval was received. That was also the position expressed at the numerous CRMC hearings conducted after the cease and desist order had issued, and that remained the position SNJ labored under throughout the subdivision review process.

On May 28, 1985, twenty-six days after having been notified by CRMC of the cease and desist order, the Citrones nonetheless signed an agreement form that extended the time of performance of the purchase and sale agreement from June 1 until October 1, 1985. SNJ, however, never signed that extension agreement form. According to Seavey and

Grunigan, the Citrones were informed of SNJ's refusal to honor the extension request, but the Citrones denied having been so informed. Meanwhile, June 1, 1985, the date of the title closing contained in the purchase and sale agreement, came and went with no agreement by the parties to the contract to set another closing date or to waive any conditions in their agreement. On June 1, 1985, CRMC had still not approved the Citrones' application for permission to construct a single family dwelling, as required by condition 1 in the purchase and sale agreement, or SNJ's application for a subdivision, pursuant to § 320(D).

On November 17, 1985, the Citrones signed a second contract extension agreement form that purported to extend the closing date in the purchase and sale agreement until February 20, 1986. Again, the extension agreement form was not signed by SNJ, and there was no intent expressed by SNJ to honor the Citrones' extension request.

On February 23, 1986, Seavey arranged to meet with the Citrones at the Coast Guard House restaurant in Narragansett. At that meeting he informed them that lot No. 11, along with the other lots subject to the cease and desist order, was being removed from the real estate market and that Seavey had been instructed by SNJ to return all the deposits that had been placed with it by prospective purchasers on the lots. Two days later, on February 25, 1986, Marie Citrone sent a letter to Seavey informing him that the Citrones were "ready, willing and able to close at any time." She also requested that if a closing was not set, the Citrones be granted a sixty-day extension to the purchase and sale agreement in order to permit them to submit additional information to CRMC in connection with their original December 26, 1984 application. On March 11, 1986, some two weeks after the Citrone letter, Jay Readyhough (Readyhough), the owner of Bay, returned the Citrones' deposit to them with a letter explaining that they would be granted a right of first refusal on the property if and when the property later became available for sale after CRMC approval. On March 27, 1986, Marie Citrone returned the deposit to Readyhough, accompanied by a letter informing him that the Citrones were going to legally enforce the September 22, 1984 purchase and sale agreement.

On July 9, 1986, the Citrones commenced a civil action in the Washington County Superior Court and on that date recorded in the North Kingstown land record office notice of lis pendens concerning the lot in question. In their civil action complaint, the Citrones, in count 1, requested specific performance from SNJ and its individual members, Bay and its individual members, and money damages from all. Count 2 alleged fraud, misrepresentation, and interference with contractual relations against defendants Bay and its individual agents. Count 3 alleged wrongful conversion by defendants Bay and its agents of certain engineering studies, percolation testing data, septic system design plans and general construction data obtained by plaintiffs. Count 4 alleged a civil conspiracy among all defendants to deprive plaintiffs of their contractual right to purchase the lot in question, lot No. 11.

Throughout all this time, including after commencement of their civil action, the Citrones continued to apply for and receive approval for an ISDS system on lot No. 11. The last of their ISDS approvals was granted on September 2, 1989. No additional applications were submitted after 1989 because additional soil and site tests would have been needed to have been performed on the property. However, the CRMC cease and desist order remained in effect, and prohibited performance of soil and site tests.

After some nineteen public hearings and after commencement of the Citrones' civil action, CRMC finally granted its assent for SNJ's subdivision of its Walmsley Lane property on October 7, 1993, and recorded that approval on November 1, 1993. As part of that assent, SNJ agreed to convey six lots to the Narrow River Land Trust (NRLT), a local and vocal environmental group that had objected to and opposed SNJ's property development plan. The NRLT was expected to pay SNJ for those lots. However, as part of the assent agreement, SNJ was required to pay to NRLT from the sales price for each of its remaining lots in the subdivision a per-

centage of the purchase price until NRLT received an amount equal to what it originally paid for its six lots. At hearing before us, counsel indicated the amount to be paid to NRLT from each lot sold by SNJ was approximately $50,000.

The plaintiffs' complaint was reached for trial on November 22, 1993, before a justice of the Superior Court sitting without a jury in Washington County. On November 24, 1993, after the plaintiffs had rested, the defendants moved to dismiss all counts in the complaint pursuant to Rule 41(b)(2) of the Superior Court Rules of Civil Procedure. The court granted those motions as to counts 2, 3, and 4, but denied the dismissal motions as to count 1, that remaining count being plaintiffs' request for specific performance and damages. On December 6, 1993, the trial concluded. At that time counsel for SNJ renewed his motion to dismiss as to count 1. The trial justice did not rule on the motion, and she then proceeded to hear closing argument of counsel and reserved decision on the merits of the case. On February 25, 1994, the trial justice, in a bench decision, found in favor of the Citrones on their request for specific performance. She ordered SNJ to convey lot No. 11 to the Citrones. She found for the defendants, however, on the Citrones' claims for damages.

It appears from the trial justice's decision that she reasoned that the CRMC cease and desist order regarding the subdivision of the SNJ property did not prevent or prohibit SNJ from conveying title to lot No. 11 to the Citrones, but only prohibited SNJ from subdividing its parcel and the use of its property for residential construction development. She held that time was not of the essence in the purchase and sale agreement and that the parties pursued the agreement until at least March 1986 when SNJ removed the property from the market. The trial justice noted that at that time the Citrones were willing to close on the property and were willing to waive condition 1 in the purchase and sale agreement, which required CRMC approval for the construction of their home. The trial justice further found that the contract theories of impossibility, frustration, and impracticability were not applicable to

the Citrones' agreement because the parties predicted the necessity of CRMC approval as shown by the conditions contained in the purchase and sale agreement, and that once the CRMC subdivision approval was obtained there could be performance. For the reasons hereinafter set out, we reverse.

## II

### Specific Performance

At the outset we reiterate once again the standard of review applied by this Court when reviewing the decision of a trial justice sitting without a jury. In such cases the "decisions of the trial justice will not be overturned unless he or she misconceived or overlooked relevant evidence or was otherwise clearly wrong." *Vargas Manufacturing Co. v. Friedman,* 661 A.2d 48, 53 (R.I.1995). In this case involving plaintiffs' request for specific performance of a purchase and sale agreement concerning real estate, that request implores equitable relief. *Griffin v. Zapata,* 570 A.2d 659, 661 (R.I.1990). Specific performance is "not a matter of right but rests within the sound discretion of the trial justice." *Eastern Motor Inns, Inc. v. Ricci,* 565 A.2d 1265, 1269 (R.I.1989)(citing *Gaglione v. Cardi,* 120 R.I. 534, 540, 388 A.2d 361, 364 (1978)). A trial justice's exercise of discretion in matters addressed to his or her discretion will not be disturbed by this Court absent a clear showing that said discretion was abused. *Hartman v. Carter,* 121 R.I. 1, 4, 393 A.2d 1102, 1105 (1978). That does not mean, however, that when a matter is addressed to a trial justice's discretion that his or her ruling is not reviewable. It more correctly means that the ruling will not be disturbed on appeal, provided the trial justice's "discretion has been soundly and judicially exercised * * * in the light of reason applied to all the facts and with a view to the rights of all the parties to the action." *DeBartolo v. DiBattista,* 117 R.I. 349, 353, 367 A.2d 701, 703 (1976); *see also Strzebinska v. Jary,* 58 R.I. 496, 193 A. 747 (1937). Although we recognize the fact that a contract should not be set aside merely because following its execution performance becomes more difficult or expensive than anticipated by the parties, *Grady v. Grady,* 504 A.2d 444

(R.I.1986), matters which cause hardship or injustice to either of the parties are certainly facts that should, in an equity proceeding, be considered by a trial justice in deciding whether to exercise his or her discretion in granting specific performance. *See Wagner v. Estate of Rummel,* 391 Pa.Super. 555, 571 A.2d 1055 (1990); *Barr v. Deiter,* 190 Pa.Super. 454, 154 A.2d 290 (1959). A review of the record in this appeal compels our conclusion that the trial justice abused her discretion in granting plaintiffs' request for specific performance.

The purchase and sale agreement concerned here listed June 1, 1985, as the closing date for lot No. 11. The conditions explicitly set out in the purchase and sale agreement gave the Citrones over three months to apply to CRMC for approval of the construction of their single family home and seven months within which to receive CRMC approval of that application. Although the Citrones submitted their application to CRMC within the time allotted, they did not receive CRMC approval of their application as required by condition 1 of the purchase and sale agreement. Contrary to the finding of the trial justice, that condition did not contemplate the subdivision approval problem that arose and its eventual resolution in October 1993, some eight years after the agreement closing date, when CRMC assent was granted. The condition in the purchase and sale agreement merely required CRMC approval for the construction of the Citrones' single family dwelling. Although the subdivision approval might amount to a satisfaction of the condition in the purchase and sale agreement,[2] the extensive and lengthy procedure required for approval was never contemplated or agreed to by the parties.

Moreover, contrary to the trial justice's decision, the record is devoid of any explicit offer by the Citrones to waive the CRMC construction permit requirement. Although the February 25 letter from Marie Citrone indicated that the Citrones were willing to close on the property at that time, her letter did not explicitly waive the conditions in the purchase and sale agreement. Additionally, her letter came almost one year after the closing date scheduled in the purchase and sale agreement and at a time when the Citrones had no legitimate reason for believing the purchase and sale agreement was still in effect. The contract extension forms requested and signed by the Citrones constituted unilateral actions on their part and were never agreed to or in fact signed by SNJ. The Citrones, according to their own trial testimony, had never been informed that SNJ had agreed to any extensions of the agreement. In fact, according to Readyhough's testimony, the Citrones had been specifically informed that their requested extensions had been rejected by SNJ. Furthermore, the unilateral attempts on the part of the Citrones to procure the extensions to the purchase and sale agreement, instead of just setting a closing date, lend further support for the conclusion that they had not in fact waived the conditions in the purchase and sale agreement. Accordingly, the Citrones' willingness to close, as expressed in the February 25 letter, was too little, too late.

There are additional factors that suggest an exercise of caution in the granting of specific performance in this case. The delay in receiving subdivision approval, a condition unforeseen by the parties when executing the purchase and sale agreement, and the conditions of the eventual assent mitigate against the granting of specific performance. Both the Citrones and SNJ were forced into compliance with CRMC's cease and desist order that prohibited the transfer of SNJ's property and that threatened the imposition of criminal sanctions for violations of the order. Furthermore, the assent ultimately issued by

---

**2.** Section 320 of the CRMC Rules and Regulations does not require separate approval for activities approved in an assent for a subdivision, presumably including the construction of a single family dwelling in the subdivision. It is not clear from the record if the Citrones' construction plans involved activities other than those approved in the subdivision assent. Accordingly, this Court cannot conclude whether condition 1 in the purchase and sale agreement was, in fact, satisfied by the subdivision assent. However, that determination is not relevant to our opinion since there are enough other facts in the record that support the conclusion that the granting of specific performance was improper.

CRMC contained the previously noted requirement that SNJ convey six lots to NRLT and pay a percentage of the purchase prices of the remaining lots to NRLT. After accounting for the amount to be paid to NRLT, as noted earlier, SNJ would realize approximately $7,900 for lot No. 11.[3] Those highly unusual exigent conditions were completely unforeseeable at the time of the execution of the purchase and sale agreement, and to compel judicial compliance with that agreement, some almost nine year later, would be most inequitable.

### III

### Conclusion

■ The record before us leads to the conclusion that neither party to the purchase and sale agreement in question was ready, willing, and able to close on the closing date listed in the agreement. The burden of proving that they were entitled to specific performance, including a showing of willingness and the ability to perform on the agreement closing date was upon the Citrones. *See Griffin*, 570 A.2d at 662 (quoting *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 114, 265 A.2d 429, 435 (1970)). The record shows no willingness on the part of

the Citrones to close on the property at the appropriate time without CRMC approval, and they continued unilaterally to extend the purchase and sale agreement indefinitely. The only time they actually expressed an interest in closing on the property, although there was still no express waiver by them of CRMC approval, was in their February 25 letter to Seavey, which was coincidentally written just after the Citrones should have realized that they were relying upon a purchase and sale agreement that had lapsed. For the above reasons, we conclude that the trial justice abused her discretion in granting specific performance.

Accordingly, SNJ's appeal is sustained, the final judgment of the Superior Court granting specific performance is reversed, and the papers of the case are remanded to the Superior Court with directions to enter judgment for SNJ, Grunigan, Tomassetti, and Nemecek.

---

**3.** This amount takes into account the $50,000 figure alluded to by counsel at oral argument *that was required to be paid to NRLT.*