# United States Court of Appeals

## For the First Circuit

No. 07-2603

JAMES H. REYELT,

Plaintiff, Appellant,

v.

WILLIAM B. DANZELL and LOUISE BEENKER DANZELL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, Senior U.S. District Judge]

Before
Boudin, Circuit Judge,
O'Connor,[*] Associate Justice (Ret.),
and Selya, Senior Circuit Judge.

Dana A. Curhan with whom Brad Bennion was on brief for appellant.
Marc DeSisto with whom DeSisto Law was on brief for appellees.

July 14, 2008

---

[*]The Hon. Sandra Day O'Connor, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  In early September 2003, James Reyelt and William and Louise Danzell (hereinafter "Danzells") completed a contract for the sale of Reyelt's waterfront property in Barrington, Rhode Island to the Danzells.  The property had two houses on a single lot, meaning that the local zoning board had to approve any changes to the buildings; and the Danzells, anxious to enlarge the present livable space, were willing to pay more if they could obtain a variance from the board permitting such renovations.

Accordingly, the parties' contract (set forth in an addendum to this decision) specified that the Danzells would pay $1,225,000 at the closing, with the price increasing later depending on the outcome of their variance application.  The Danzells agreed to apply for a variance within three months of closing and, if the variance were issued within one year after application, to pay $200,000 more to Reyelt.  Alternatively,

> [i]n the event that the Variance is not granted within one year after application and the Buyers have been diligent and used good faith in their processing of said application for a Variance, or if the Variance has been denied and any appeal period has expired, then the Buyers shall pay over to the Seller $100,000 . . . .

The contract further provided that the Danzells would deliver, at the closing, a one-year promissory note for $200,000 bearing interest at 5 percent.  If the variance were granted within one year of the application, the note was to be paid immediately with interest to the point of payment; if instead the application

-2-

were not approved within one year, the $100,000 became payable as the sole addition to the price of the house and supplanted the principal of the note (but the full original interest promised in the note remained due).

The closing occurred on October 30, 2003, so the application for the variance should have been filed by late January 2004. But despite some prodding from Reyelt's attorney, the Danzells did not submit an application until August 18, 2004-- apparently due in part to some confusion about whether their closing attorney would prepare the application. The final application, prepared by a new attorney in concert with a local architect, Jay Litman, proposed to double the size of one of the two houses on the property.

The zoning board held a hearing on October 21, 2004-- about a week short of one year after the closing. Testimony came from Litman, the Danzells' attorney and local residents who opposed the project. After discussion, the board unanimously rejected the application, noting that the expansion would "heighten [the property's] non-conformi[ng use]" and approach a shared property line; two members added that the application lacked detail showing what the completed structure would look like.

The Danzells then offered to pay Reyelt $100,000 plus interest. Reyelt refused the offer and brought suit to recover the full $200,000. After a bench trial, the district court awarded

Reyelt only $100,000 (plus an interest payment that is not disputed on the appeal). The court ruled that the Danzells' failure to file for a variance within three months did not warrant a larger award and their efforts to secure the variance were adequate. This appeal followed.

Our review of the district court's legal conclusions is de novo; the court's factual findings are reviewed only for clear error, Rational Software Corp. v. Sterling Corp., 393 F.3d 276, 276-77 (1st Cir. 2005), but anyway Reyelt does not dispute them. The parties agree that Rhode Island law controls. Reyelt's first claim is that the delay in filing the application entitled him to the $200,000; his second, that the Danzells' application was not an adequate effort.

The district judge wrote a typically thorough and lucid decision and the result is intuitively obvious in light of the court's detailed fact-findings, abbreviated above. We write, albeit only briefly, because two of the district court's legal rulings touch on recurring problems and our own imprimatur may be useful. One of those problems--the significance of the three-month application period--is especially interesting and we begin with it.

The usual contract contains mutual commitments and this one, as part of the transaction, explicitly required the Danzells to file the zoning application within three months of the closing. Without any adequate excuse, the filing was over six months after

that deadline.  And the three-month deadline obviously mattered in the sense that it served a useful purpose for Reyelt:  it increased the likelihood of his getting $200,000 rather than $100,000 and also of getting it promptly.

Of course, when the filing was delayed until August, Reyelt did not try to undo the sale, nor did he immediately assert a breach of contract claim; rather, he waited to see the outcome. The district court might have viewed this as a waiver by Reyelt but, under the circumstances, the waiver argument would not be straightforward.  Both sides apparently wanted the contract to succeed, so why should the law put Reyelt to the choice of forfeiting his objection or torpedoing the contract earlier?

Absent a waiver, the question remains, why Reyelt cannot now recover based on the Danzells' breach of an express term in the contract?  One part of the answer, emphasized by the district judge, is that the three-month period should not be read as a mechanical requirement but as a benchmark for measuring diligence. Courts are often (although not always) more forgiving of failures to meet time provisions in contracts than, say, of failures to pay the price agreed.  2 Farnsworth, Farnsworth on Contracts § 8.18 (3d ed. 2004).

Rhode Island courts share this view.  "Ordinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that a breach

of the time element will excuse nonperformance." Lajayi v. Fafiyebi, 860 A.2d 680, 688 (R.I. 2004) (quoting Jakober v. E.M. Loew's Capital Theatre, Inc., 265 A.2d 429, 435 (R.I. 1970)). Context matters: In a contract for the sale of land, a modest delay might be tolerable, e.g., Thompson v. McCann, 762 A.2d 432, 438 (R.I. 2000); for deliveries of "just in time" inventory to a manufacturing plant, a more rigid adherence might be expected.

Still, when the contract was made, Reyelt might well not have agreed that nine months fell within the target area. Although the contract allowed a year for approval after filing, the promissory note was to mature one year after the closing; this itself indicates that the parties were counting on the zoning proceeding to be wrapped up by the end of that year. A filing in three months--easily feasible, it appears--would make that outcome more likely than a filing in nine.

But although the filing was delayed for six months beyond the original deadline, the zoning board did render its decision within one year of the closing. And courts, in assessing contract claims, tend to look at what happened as well as what the parties expected to happen. In describing a breach as "material" vel non, contract case law--unlike evidence law's use of the term--looks primarily at whether a breach caused harm or significantly impaired the benefit of the contract. "The question is whether the breach

-6-

is material, not whether there was a breach of a material term." 2 <u>Farnsworth on Contracts</u> § 8.16, at 517 & n.1.[1]

If eight months after the closing Reyelt had sought to cancel the contract based on a material default, a court might (or might not) think that the delay had impaired the prospective value of the contract.[2] By contrast, for Reyelt to demand $200,000 now, when we know that the zoning board in fact decided within one year of the closing (and flatly rejected the request on the merits), is much less attractive--and for good reason. As matters turned out, the delay, although undue, did not <u>cause</u> the loss of the extra money.

One can imagine a case where delay did cause harm, for example, where some small defect doomed the variance application and, had the application been timely filed, could quickly have been remedied. But as the district judge explained, the gist of the board's reason for the rejection was that the double-in-size

---

[1]<u>E.g.</u>, <u>Rolscreen Co.</u> v. <u>Pella Prods. of St. Louis, Inc.</u>, 64 F.3d 1202, 1212 n.8 (8th Cir. 1995) (failure to comply with provision in distribution agreement not material where no damage or prejudice shown); <u>Gibson</u> v. <u>City of Cranston</u>, 37 F.3d 731 (1st Cir. 1994); <u>Qualcomm Inc.</u> v. <u>Texas Instruments Inc.</u>, 875 A.2d 626, 628-29 (Del. 2005). <u>See</u> <u>also</u> <u>Restatement (Second) of Contracts</u> § 241 (1981).

[2]<u>See</u> <u>Helgar Corp.</u> v. <u>Warner's Features, Inc.</u>, 119 N.E. 113, 114 (N.Y. 1918) (Cardozo, J.) (whether termination of a contract is permitted depends on whether "the default is so substantial and important . . . to defeat the essential purpose of the parties"). <u>See</u> <u>also</u> <u>Lajayi</u>, 860 A.2d at 688-89; 2 <u>Farnsworth on Contracts</u> § 8.15, at 510-12.

building sought by the Danzells was just "too big" in a situation where having a second house at all already made the property non-conforming.

Reyelt's other claim of error relates not to the breach of the filing deadline but to the Danzells' competence, or lack of it, in seeking approval. The contract, it will be recalled, said that $100,000 (plus interest) would satisfy the $200,000 note if zoning approval were not secured within one year "and the [Danzells] have been diligent and used good faith in their processing of said application." Reyelt says that, timing aside, the application was a half-baked job.

The diligence and good faith requirements might appear to matter only if the board failed to act within one year; this is perhaps too narrow a reading, but anyway the district judge read the Danzells' obligation to include reasonable efforts to secure the variance. In Rhode Island, as elsewhere, such an implied "best efforts" obligation is commonly read into agreements that require a party merely to seek a specific result (rather than promising to achieve one). Bradford Dyeing Ass'n, Inc. v. J. Stog Tech GMBH, 765 A.2d 1226, 1237 (R.I. 2001); 2 Farnsworth on Contracts § 7.17c.

Reyelt says that the district judge nevertheless misread the implied obligation solely to require good faith, but the trial judge explicitly ruled that reasonableness was also required. He quoted the Rhode Island court in Bradford to this effect, 765 A.2d

at 1235, and went on to evaluate the reasonableness of the Danzells' efforts. He noted, but sensibly did not apply, our own conflation of the two terms in Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc., 832 F.2d 214, 225 (1st Cir. 1987), cert. denied 485 U.S. 935 (1988).

The district court noted that the Danzells had hired a Rhode Island architect with thirty years' experience and that their lawyer who assisted in the application process had appeared before the zoning board over 100 times. He then addressed Reyelt's main objection to the adequacy of the application, namely, that it was accompanied by four diagrams indicating the footprints and outlines of the existing and proposed construction but did not contain what is referred to as a "schematic design."

The former cost the Danzells $4,700 to prepare; the latter, which they did not authorize, would have added $24,000 more to the bill. Apparently no formal requirement existed for submission of a schematic design, although two board members' comments suggested that a better sense of the new building's appearance would have been helpful. However, taking the board comments as a whole, the district court found that the basic and conclusive objection was to a major enlargement of an already non-conforming structure, and we agree.

Reyelt's brief does not attack this finding but, returning to diligence, suggests that a timely application would

have given the Danzells time to submit a revised proposal seeking a smaller structure. But a major enlargement was seemingly the Danzells' aim from the outset; its approval was a condition of the extra $100,000 payment; and a reasonable effort does not entail one side's giving up a main objective or spending disproportionately to achieve it.

Reyelt did not bargain for any restriction on the size of the proposed enlargement. Nor is there proof that the Danzells submitted the proposal in bad faith, expecting it to be rejected and planning later to submit a more modest proposal. Each side assumed a risk--the Danzells that they would not get the enlargement they sought and Reyelt that he would get only $100,000 more--and that is just what happened.

Affirmed.

ADDENDUM

The parties hereby agree to the following:

1.  The Buyers agree to execute a promissory note as part of the purchase price at the time of the closing in the amount of $200,000 @ 5% interest due and payable one year from the closing date, or any written extension signed by the parties.

2.  The Buyers intend to file for a Variance with the Town of Barrington seeking to remove the present house, building a new house and/or reconstructing the house with a new configuration.  The Buyers agree that they will file for a Variance within three months of the date of the closing date and the Seller agrees that if the Variance is filed prior to the closing, that he will sign the Variance as the owner of the property and cooperate with the buyers as long as he is the owner.

3.  In the event that the Variance is granted within one year of the date of application, then the Buyers shall forthwith pay the promissory note of $200,000 in full with interest thereon @ 5% per annum in arrears, meaning from the date of closing to the date of payment to the Seller.

4. In the event that the Variance is not granted within one year after application and the Buyers have been diligent and used good faith in their processing of said application for a Variance, or if the Variance has been denied and any appeal period has expired, then the Buyers shall pay over to the Seller $100,000 and %5 per annum interest on the full value of the note of $200,000 at the time of the denial or at the expiration of any appeal that is processed, together with the interest thereon.  The price of the house will be reduced if this provision comes into existence

to $1,325,000 plus interest on the face value of the note and all other obligations of the parties shall cease.