September 12, 2023

**Supreme Court**

No. 2022-74-Appeal.
(PC 20-7250)

(Concurrence and Dissent begin
on Page 42)

Kevin Bennett et al.      :

v.      :

Angela Steliga, individually and      :
personally and as Trustee of The Angela
M. Steliga Living Trust dated
January 14, 2013, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Kevin Bennett et al.          :

v.                            :

Angela Steliga, individually and          :
personally and as Trustee of The Angela
M. Steliga Living Trust dated
January 14, 2013, et al.

Present: Suttell, C.J., Goldberg, Robinson, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**   The defendants, Angela Steliga,

individually and personally and as trustee of The Angela M. Steliga Living Trust

dated January 14, 2013, and The Angela M. Steliga Living Trust dated January 14,

2013 (Steliga and the trust, respectively), appeal from a Superior Court judgment in

favor of the plaintiffs, Kevin Bennett and Elizabeth Pawlson, following the Superior

Court's grant of summary judgment on count one and count three of the plaintiffs'

complaint.[1]  This case came before the Supreme Court pursuant to an order directing

---

[1] Steliga and the trust are both defendants in this case.  However, we mostly refer to them separately throughout this opinion, rather than collectively as "defendants."

- 1 -

the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court.

# I

## Facts

This appeal centers on the proposed purchase and sale of property located at 63 Patterson Avenue, Warren, Rhode Island (the property). Unless otherwise noted, these facts are undisputed.

On June 18, 2020, Steliga listed the property for sale in her capacity as trustee of the trust.[2] The trust owned and held title to the property; Steliga had no claim of ownership or title to it as an individual. Steliga hired Ron Rupp as her real estate agent for the sale and listing.

Around the same time, plaintiffs engaged real estate agent Tammy Bass to help them find and purchase a home in Rhode Island. They placed an offer on the property and Steliga submitted a counteroffer, which plaintiffs accepted. The parties

---

[2] All dates referenced herein occurred in 2020, unless otherwise indicated.

signed a purchase and sales agreement (P&S) for the property on July 18. The plaintiffs paid a deposit of $31,250 and set the closing date for September 30.

The parties executed two key documents in connection with the sale: the seller's disclosure and the P&S. Rupp prepared the seller's disclosure and Bass prepared the P&S, both using standard forms created by the Rhode Island Association of Realtors.

The seller's disclosure form listed the "Seller" of the property as "Angela M. Steliga." The form also indicated that the property was to be conveyed by trustee's deed. Bass used this information from the seller's disclosure form to prepare the P&S. When she drafted the P&S, Bass "mimicked the name that Mr. Rupp provided on the sales disclosures" to populate the space designated for the seller's name. At the time, Bass knew that the deed was to be conveyed by the trustee and "[she] assumed that Mr. Rupp would have put the correct name on the sales disclosures * * *." Accordingly, Bass listed the "Seller" on the P&S as "Angela M. Steliga." Steliga signed her name on the P&S in the space designated for the "Seller."

The P&S contained two important contingencies. First, a mortgage contingency: "[The P&S] is subject to Buyer obtaining a commitment letter issued by an institutional mortgage lender or mortgage broker ('Lender') on or before 08/17/2020," according to certain specified terms.

Second, an inspections contingency, which allowed the buyer ten days "to conduct and complete inspections, obtain inspection reports, deliver to Seller or Listing Licensee any and all requests relating to inspections, obtain Seller's response, and resolve all such requests with Seller in writing or this contingency shall be deemed waived." The inspections contingency also stated in relevant part, "Buyer may terminate this [P&S] by *sending written notice of termination* to Seller or Listing Licensee" for several listed reasons; for example, if "Buyer is not satisfied with the results of the inspections[.]" (Emphasis added.) However, the next subsection provided that "[i]f Buyer fails to deliver such *written notice of termination*, this Contingency shall be deemed waived and Buyer will forfeit Buyer's right to terminate this [P&S] based on the Inspections Contingency." (Emphasis added.)

The written notice requirement contained in the inspections contingency extended to the entire P&S. The document provided in relevant part, "All notices as required in specific Sections of this [P&S] shall be *in writing*"; and "This [P&S] may not be changed, modified, or amended in whole or in part except *in writing*, signed by all parties." (Emphasis added.)

Once the parties signed the P&S, an inspection of the property was conducted on July 28 with plaintiffs, Bass, and Rupp all present. After the inspection, plaintiffs compiled a list of requested repairs for Steliga, which they drafted into a repair

addendum. With the repair addendum, plaintiffs prepared an amendment to the P&S, which proposed adding a $5,500 credit to plaintiffs' closing costs.[3] Bass explained that the closing credit was proposed as a means to help plaintiffs pay for the requested repairs, if Steliga elected not to pay for them herself.

The plaintiffs signed the repair addendum on July 31; Steliga did not. The events following Steliga's decision not to sign the repair addendum are disputed. Three witnesses were deposed—Steliga, Rupp, and Bass—each providing his or her own account.

To begin, Steliga explained that the last time she was involved in a purchase and sale of real property was in 1992, when she and her husband, now deceased, purchased the Patterson Avenue home and her husband had handled everything. She conceded that she was only "[s]omewhat" familiar with the process of selling a home and understood that she would "have to hire a real estate broker." Steliga confirmed that Rupp advised her throughout the entire sale process, and she stated that she did not retain an attorney until the end of July, after she had signed the P&S.

Steliga explained that she did not sign the repair addendum after the home inspection because she did not wish to pay for any repairs. Steliga's deposition,

---

[3] Our references herein to "the repair addendum" encompass both the repair addendum and the amendment, "amendment A," as it is referred to in the record, because these documents were drafted simultaneously and intended to amend the P&S in tandem.

however, revealed her confusion about the repair addendum's power to terminate the P&S. Primarily, Steliga stated that she believed the property had been listed for sale "as is." Listing the property for sale "as is," according to Steliga's professed understanding, meant that any request for repairs by plaintiffs automatically canceled the P&S.

Once Steliga made her decision to refuse the repairs, Rupp and Bass discussed it over the phone on or around August 5 or 6. The contents of the call are disputed.

In Rupp's deposition, he testified that, after he informed Bass of Steliga's decision, Bass then told him that plaintiffs were "backing out" of the sale as a result of Steliga's refusal. Rupp additionally testified, however, that Bass called him "the next day" to say that plaintiffs had "changed their minds and they want[ed] to move forward." Rupp acknowledged that plaintiffs never sent a written notice of termination of the P&S and that written notice was the only way to amend or cancel the contract. Rupp testified that he "had to have" informed Steliga, at the time, that plaintiffs could only terminate the P&S by written notice.

Bass recalled her phone conversation with Rupp quite differently. In her deposition, Bass testified that she spoke with Rupp on the phone about Steliga's decision to forgo the repairs; but then, according to Bass, she told Rupp that she "would have to have a conversation with [her] clients * * *." Bass testified that she never told Rupp that plaintiffs no longer planned to purchase the home and that she

never drafted a notice of termination to that effect. In fact, Bass stated that plaintiffs never told her that the repairs were a requirement for them to purchase the property and that they wanted to move forward with the sale. Bass confirmed that she relayed plaintiffs' decision to Rupp in a later conversation. She also corroborated Rupp's testimony that nothing "was ever sent in writing per our [P&S]" to terminate the agreement.

As to the cost of the repairs, Bass conceded, the $5,500 closing credit was intended to cover only the cost of the sliding doors which plaintiffs requested; the total cost for the remaining repairs was never determined. Bass averred that, typically, the seller is responsible for obtaining an initial quote for the requested repairs and then negotiations proceed from there. Yet, Bass confirmed that an agreement on the repairs was never reached. She also indicated that she and plaintiffs were waiting for Rupp and Steliga to come back to them with a proposed number. She said, "I was hoping that [Rupp] was seeking out contractors."

Steliga never testified that she was aware of her responsibility to get quotes from contractors for the repair costs, although she was not explicitly asked. Steliga testified only that Rupp never discussed her options to negotiate the repairs or the

associated costs. Rupp claimed he did. Steliga merely stated that she believed that, once plaintiffs told Bass that they were walking away, the P&S was terminated.[4]

Steliga further explained that she understood plaintiffs' repair addendum and the subsequent "back and forth" regarding the repairs to be a "renegotiati[on]" that canceled the original P&S and proposed "a new contract." When probed about whether she ever asked her real estate agent or her attorney if her grasp on "renegotiation" was accurate, Steliga said, "No."

Steliga testified that, prompted by her belief that plaintiffs' verbal indication and repair addendum canceled the P&S, on or about August 13, she terminated another purchase and sales agreement that she had signed for a home in Seekonk, Massachusetts, where she planned to move after selling the property. When asked what led her to sign a release of the Seekonk purchase and sales agreement, Steliga explained that she "[could not] pay two mortgages." Steliga stipulated that Rupp

---

[4] When asked during her deposition, specifically, whether Steliga believed plaintiffs could walk away from the P&S simply by a verbal indication, she responded in the affirmative. When asked whether Rupp ever advised her that plaintiffs could not verbally cancel the P&S, she responded, "No." When asked whether Rupp ever discussed the "steps [plaintiffs] would need to take to walk away" from the P&S, Steliga again responded, "No." When asked why she did not query her attorney about the process for canceling the P&S, Steliga answered, "Because I got *the verbal* that they were going to walk away." (Emphasis added.) Steliga confirmed that she never received a written notice of termination from plaintiffs canceling the P&S or any other written notification indicating their disinterest in moving forward with the sale.

coordinated the release of the Seekonk property on her behalf, which he confirmed through his own testimony.

Rupp testified that Steliga told him that she no longer wished to sell the property because her children did not want to move. According to Rupp's deposition, after Steliga expressed her doubts about the sale, he told her that, if she wished to back out of the P&S, it would be "a mess" because "we have a contract * * * that's binding" and advised her to contact an attorney immediately. Further, Rupp testified that he had never been placed in a similar situation before and was not certain how to proceed.

On or around August 8, Rupp called Bass at Steliga's direction to inquire about returning plaintiffs' deposit for the property. Ultimately, Rupp stated, he never returned the deposit because Bass had called him shortly after to let him know that plaintiffs were moving forward. At this point, Rupp explained, he understood that there would be a dispute over the property and made no further effort to return the deposit.

After the inspection and requested repairs, the next step to move forward with the sale was to appraise the property. However, Steliga did not permit the appraiser to enter the property. Steliga testified that "there was no contract, so we're not going to do the appraisal."

On August 13, plaintiffs' attorney wrote a letter to Steliga's attorney advising him that "[plaintiffs] remain ready, willing and able to close * * * pursuant to the [P&S.]" The same letter stated, "It has come to my attention that [Steliga] may have indicated an intent to breach the [P&S] and wished to cancel the same." On August 17, plaintiffs obtained a commitment agreement from a lender that complied with the P&S's mortgage contingency and sent that letter to Rupp.

Then, on August 21, plaintiffs' counsel sent a letter to Steliga and her counsel, which reiterated that plaintiffs "remain ready, willing and able to close this transaction." The letter further warned Steliga and her counsel that plaintiffs "have relied upon Ms. Steliga's representation contained in the [P&S]. They have sold their property in Brooklyn, New York and have made plans to move to Rhode Island." The letter claimed that any attempt on Steliga's part to argue that the P&S was unenforceable because she signed it in her individual capacity, not in her capacity as trustee, would fail before a Rhode Island court. Lastly, the letter asserted, there were "no circumstances" under which Steliga could avoid the P&S, and that judicial enforcement of the contract by specific performance was likely. Steliga's attorney acknowledged receipt of these correspondences by a letter to plaintiffs' attorney dated August 31.

On September 21, plaintiffs' lawyer handling the closing emailed Steliga's counsel to inquire about the final documentation necessary to complete the closing

on September 30. Steliga's counsel responded by email asserting, "There is no agreement—we were informed [plaintiffs] canceled and requested return of deposit." On September 29, plaintiffs' attorney emailed, "We are moving forward as planned with the [P&S] which is scheduled for tomorrow. I have been advised by [plaintiffs'] counsel that we have a valid [P&S] and * * * [plaintiffs] are ready to perform per the terms of the contract."

But on September 30, neither Steliga nor Rupp appeared, and thus the closing did not occur.

## II

## Travel

On October 16, plaintiffs filed a complaint in Providence County Superior Court against defendants. The plaintiffs' complaint contained the following causes of action: declaratory judgment (count one); breach of contract (count two); anticipatory repudiation (count three); estoppel (count four); fraud (count five); fraudulent misrepresentation (count six); fraudulent inducement (count seven); and an injunction (count eight). In their prayer for relief, plaintiffs requested that the Superior Court (1) enjoin Steliga from taking further action or nonaction concerning the property; (2) issue a declaratory judgment that the P&S was signed by Steliga in her capacity as trustee, that the P&S remained valid, enforceable, and binding, and which identified, declared, and enforced the legal rights of the parties under the P&S;

(3) reform the P&S as necessary and required; (4) order specific performance for Steliga to complete the sale and closing on the property; (5) enter judgment in favor of plaintiffs on all counts contained in the complaint; and (6) award plaintiffs damages, including punitive damages, as well as reasonable attorneys' fees.

Steliga filed her initial answer to the complaint on November 9. On February 25, 2021, Steliga filed an amended answer, which contained counterclaims against plaintiffs, including (1) "anticipatory repudiation and/or repudiation"; (2) "[b]reach of [c]ontract and of fair dealing and good faith"; and (3) "lack of clean hands and no right to specific performance."

On April 15, 2021, plaintiffs moved for specific performance for the sale of the property, to which Steliga objected. Then on September 23, 2021, plaintiffs moved for summary judgment on count one (declaratory judgment) and count three (anticipatory repudiation) of the complaint and reiterated their request for an order of specific performance, as well as an award for reasonable attorneys' fees. Steliga again objected. On January 12, 2022, a justice of the Superior Court issued a bench decision granting the motion for summary judgment in favor of plaintiffs on both counts. At the time of the decision, Steliga was still living at the property.

Regarding summary judgment on count one, the hearing justice ruled in favor of plaintiffs and granted a declaratory judgment that the P&S was valid. In particular, the hearing justice found that Steliga's signature exhibited proper

authority to convey the property and that the P&S was never otherwise terminated by written notice. On the matter of Steliga's signature, the hearing justice based his analysis on this Court's holding in *Yates v. Hill*, 761 A.2d 677 (R.I. 2000), where we examined a similar issue under analogous facts. *See Yates*, 761 A.2d at 680. In consonance with the *Yates* holding, the hearing justice decided, as a matter of law, that Steliga had "clothed herself with the clear authority to convey the property by conceding that she[,]" as trustee, "had the power to convey the property." Therefore, he determined, her signature was valid and the P&S consequently was enforceable.

The hearing justice additionally found "no genuine dispute as to whether buyers sent any written notice indicating an intention to terminate the agreement, nor is there a genuine dispute as to whether any release was signed by both Ms. Steliga and [plaintiffs]." The signed repair addendum from plaintiffs, he further found, had no bearing on the validity of the P&S.

The hearing justice acknowledged that whether plaintiffs "orally indicated that [they] were backing out of the agreement" remained a disputed fact. However, the hearing justice found that this fact was immaterial for purposes of summary judgment. Because the P&S could not be terminated orally, the hearing justice recognized, any factual dispute as to plaintiffs' verbal indication about "walking away" was inconsequential. In the absence of any disputed material facts, the hearing justice granted plaintiffs' motion for summary judgment on count one.

On count three, anticipatory repudiation, the hearing justice noted the undisputed fact that Steliga refused to convey the property to plaintiffs. This action, the hearing justice concluded, amounted to anticipatory repudiation of Steliga's obligation to perform under the P&S, as a matter of law. Citing this Court's opinion in *Griffin v. Zapata*, 570 A.2d 659 (R.I. 1990), the hearing justice reasoned that "a repudiation can be evidenced by either a statement to that effect or a voluntary affirmative act * * *." *See Griffin*, 570 A.2d at 662. Not only did Steliga tell Rupp that she no longer wanted to sell the property, but further, despite Steliga's recalcitrance, plaintiffs evidenced their continued readiness and willingness to purchase the property through communications from their attorney. Steliga and her attorney, the hearing justice stated, were notified multiple times of plaintiffs' desire to move forward. Yet, Steliga continued to withhold the conveyance.

Next, addressing plaintiffs' request for specific performance, the hearing justice began by acknowledging that plaintiffs properly presented the Superior Court with "an actual case of controversy" having suffered injury from Steliga's refusal to convey the property. Consequently, he determined that the Superior Court should enter a judgment that the P&S was valid and order specific performance of the P&S.

Finally, the hearing justice applied G.L. 1956 § 9-1-45, which provides for the award of reasonable attorneys' fees to prevailing parties in civil actions for

- 14 -

breach of contract, and found that plaintiffs were entitled to an award of reasonable attorneys' fees pursuant to the statute.

An order entered on January 24, 2022, granting summary judgment, declaring the P&S valid, binding, and enforceable, ordering specific performance of the property conveyance, and awarding reasonable attorneys' fees to plaintiffs. A final judgment, under Rule 54(b) of the Superior Court Rules of Civil Procedure, providing the same then entered on February 22, 2022. Steliga filed a timely notice of appeal on February 23, 2022.

## III

### Discussion

On appeal, Steliga argues that the hearing justice committed several errors in granting summary judgment on counts one and three of the complaint.[5] She suggests that the hearing justice wrongly declared the P&S to be valid, binding, and enforceable because Bass knew that Steliga did not sign the P&S in her capacity as trustee. Steliga suggests that this error resulted in an improper order of specific performance. We review each of these arguments in turn.

---

[5] A careful review of the docket revealed that Steliga's prebriefing statement electronically filed in this Court on May 13, 2022, pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, did not match the hard-copy version that she submitted on May 17, 2022. We glean Steliga's arguments from the electronically filed version.

# A

## Motion for Summary Judgment

Steliga appeals the hearing justice's grant of plaintiffs' motion for summary judgment on count one (declaratory judgment) and count three (anticipatory repudiation) of the complaint.

## Standard of Review

"This Court reviews *de novo* a [hearing] justice's decision granting summary judgment." *McNulty v. Chip*, 116 A.3d 173, 179 (R.I. 2015) (quoting *Sola v. Leighton*, 45 A.3d 502, 506 (R.I. 2012)). "Examining the case from the vantage point of the [hearing] justice who passed on the motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party * * *." *Yanku v. Walgreen Co.*, 224 A.3d 1130, 1132-33 (R.I. 2020) (quoting *Ballard v. SVF Foundation*, 181 A.3d 27, 34 (R.I. 2018)).

"Summary judgment is appropriate when no genuine issue of material fact is evident from the pleadings, depositions, * * * and admissions on file * * * and the [hearing] justice finds that the moving party is entitled to prevail as a matter of law." *Kemp v. PJC of Rhode Island, Inc.*, 184 A.3d 712, 716 (R.I. 2018) (quoting *Providence Journal Co. v. Rhode Island Department of Public Safety ex rel. Kilmartin*, 136 A.3d 1168, 1173 (R.I. 2016)). Further, "the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of

material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions." *Fogarty v. Palumbo*, 163 A.3d 526, 532-33 (R.I. 2017) (quoting *Newstone Development, LLC v. East Pacific, LLC*, 140 A.3d 100, 103 (R.I. 2016)).

## Anticipatory Repudiation

Before this Court, Steliga argues that the hearing justice erred in concluding that she did repudiate the contract and, conversely, that plaintiffs did not. In making these determinations, Steliga contends, the hearing justice made several findings of fact inappropriate for a motion on summary judgment.

First, Steliga asserts that whether plaintiffs terminated the P&S was a disputed fact. Steliga cites allegedly "diametrical" testimony from Rupp and Bass regarding plaintiffs' statements about walking away and Steliga's decision not to sell the property. Steliga claims that the hearing justice's failure to address these "material disputed facts" was in error.

Steliga also assigns error to the hearing justice's "finding as undisputed facts" that Steliga refused to perform under the P&S and that she knew the contract was not terminated. Instead, Steliga alleges that disputed issues remained as to whether "plaintiffs terminated the contract" and whether they "[sought] a new favorable contract and material change to require [Steliga] to pay for open-ended repairs * * *." Steliga argues that the undetermined repairs price terminated the P&S,

constituted renegotiation in bad faith, and demonstrated that plaintiffs were "no longer being ready, willing and able buyers." (Emphasis omitted.)

Additionally, Steliga claims that the hearing justice mistakenly relied on "oppositive testimony" to determine that Steliga failed to perform under the P&S. Steliga highlights the part of Rupp's deposition where, when asked whether Steliga ever asked him about any ways she might get out of the P&S, he responded, "I really don't know." Steliga also references Bass's deposition where, when asked—"Did Mr. Rupp tell you at any point that Ms. Steliga was not going to sell the home?"— she responded, "I don't know * * *." These testimonies together, Steliga avers, cast doubt on her purported intention to abandon the sale and created a dispute of material fact.

In answer to these arguments, plaintiffs simply note that Steliga's failure to appear at the closing on September 30 was undisputed, which on its own constitutes a repudiation of her contractual obligation and warrants affirmance of the hearing justice's grant of summary judgment. Plaintiffs aver that all the material facts in this case were undisputed at summary judgment and, therefore, the hearing justice's grant of the motion was proper.

The hearing justice buttressed his conclusion that plaintiffs' oral statements did not cancel the contract with undisputed evidence in the record that the P&S "could only be modified or amended in writing." He noted that "the agreement was

- 18 -

binding and that the process of canceling the agreement would be to notify both parties in a signed release[,]" and "[n]either * * * Steliga nor * * * Rupp received anything in writing from buyers indicating buyers were going to walk away[,]" and "[plaintiffs] never sent any notice of termination." Though the hearing justice acknowledged that "there remains a dispute as to whether buyers orally indicated that buyers were backing out of the agreement[,]" he elucidated that "oral termination of the [P&S] is not valid[,]" and therefore plaintiffs' statements were immaterial.

We agree. Any oral statements plaintiffs may have made to Bass about "walking away" from the P&S had no impact on its validity—especially because Bass explicitly told Rupp that plaintiffs wished to proceed with the sale, which is undisputed from both deponents' testimonies.

Next, in regard to the repair costs, the hearing justice held that "[plaintiffs'] repair addendum did not constitute a termination of the [P&S]." He first recounted the process for negotiating repairs, as laid out in section 16 of the P&S and Bass's testimony. He stated that, "if [the] parties [were] not able to come to terms on repair negotiations, * * * the buyer would notify the seller in writing and let the seller know of the termination." The hearing justice noted that plaintiffs sent no such written notification and that "[n]othing in the [P&S] required [plaintiffs] to provide written notice that although Ms. Steliga refused to make the requested repairs, [plaintiffs]

still intended to move forward with the purchase of the property." At all times, the hearing justice determined, plaintiffs were "ready, willing, and able to perform their part of the agreement."

It is clear from the evidence that the P&S required termination by written notice and that no such notice was ever sent. Additionally, none of the back and forth over the repairs impacted the continued validity of the P&S, despite Steliga's understanding to the contrary. It is well settled that, as the party that stood to benefit from the inspections contingency, plaintiffs were entitled to waive the inspection and the repairs without affecting either party's continued obligation to perform. *See Blanchard v. Wells*, 844 A.2d 695, 697 (R.I. 2004) ("[I]t is well established by this Court that 'a party may waive a condition precedent if the condition is for the benefit of the waiving party.'" (quoting *Thompson v. McCann*, 762 A.2d 432, 436 (R.I. 2000))). The repair addendum, on its own, does not suggest that plaintiffs were unwilling or unready to proceed with the sale. *See id.*

Finally, regarding Steliga's claim that the hearing justice relied on disputed testimony from Rupp and Bass to conclude that she intended to repudiate her obligations under the P&S, we are not persuaded. Even though Rupp testified that he did not know, specifically, whether Steliga was looking to "get out" of the P&S, he clearly testified that she no longer wished to proceed on account of her children. Further, there is undisputed evidence in the record that Steliga's attorney contacted

plaintiffs' counsel to inform him that the deal was off and that Steliga would not attend the closing.

We perceive that Steliga has failed to prove the existence of a disputed issue of material fact by competent evidence; accordingly, viewing the evidence in the light most favorable to her, we proceed to our review of the anticipatory repudiation claim. *Fogarty*, 163 A.3d at 532-33.

"Anticipatory repudiation 'occurs when the promisor unequivocally disavows any intention to perform when the time for performance comes.'" *Management Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1175 (R.I. 2019) (quoting Black's Law Dictionary 1496 (10th ed. 2014)). In this Court's seminal opinion on anticipatory repudiation, *Thompson v. Thompson*, 495 A.2d 678 (R.I. 1985), we professed that "in order to give rise to an anticipatory breach of contract the * * * refusal to perform must have been positive and unconditional." *Thompson*, 495 A.2d at 682 (quoting 11 Williston, *Contracts* § 1322 at 130 (3d ed. Jaeger 1968)).

In *Griffin*, we explored in greater depth the "positive and unconditional" standard for anticipatory repudiation. *See Griffin*, 570 A.2d at 662 (quoting *Thompson*, 495 A.2d at 682). We determined that the combined "actions and statements" by a property seller and the seller's attorney, which suggested that the seller intended to skip the property closing in contravention of his contractual obligations, rose to anticipatory repudiation. *Id.*; *see Management Capital, L.L.C.*,

- 21 -

209 A.3d at 1176 (reasoning that "statements, together with [a letter] from [the appellee's] attorney" constituted "ample evidence" of an intention to violate the contract).

It is undisputed that Steliga did not appear at the closing. Rupp testified that she informed him of her change of heart about selling the property because of her children's desire to stay. Rupp also testified that he asked Bass about returning plaintiffs' deposit. Further, it is well documented through letter and email exchanges between Steliga's and plaintiffs' respective attorneys that Steliga had no intention of appearing at the closing, even after being informed that plaintiffs remained "ready, willing, and able" to proceed. All of these actions and statements, taken together, more than satisfy our "positive and unconditional" standard for anticipatory repudiation. *See Griffin*, 570 A.2d at 662. Therefore, we affirm the hearing justice's conclusion that Steliga repudiated the P&S as a matter of law.

Steliga contends that, in fact, plaintiffs verbally repudiated the P&S and that the hearing justice gave improper weight to "Rupp's opinion" that the P&S could only be canceled by written notification, which she insists is "contra Thompson's anticipatory repudiation case law." The anticipatory repudiation caselaw Steliga alludes to, reviewed *supra*, does not support her argument that plaintiffs repudiated the contract because all of their actions and uncontested statements indicate a desire to proceed. This argument has no merit.

## Declaratory Judgment

As to count one, the hearing justice granted plaintiffs' request for a declaratory judgment that the P&S was valid, binding, and, enforceable; as a result of that determination, he then ordered specific performance of the P&S.

The Uniform Declaratory Judgments Act, G.L. 1956 § 9-30-2, provides:

> "Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

The initial inquiry in a complaint for declaratory judgment is "whether the Superior Court has been presented with 'an actual case or controversy.'" *Key v. Brown University*, 163 A.3d 1162, 1168 (R.I. 2017) (quoting *N & M Properties, LLC v. Town of West Warwick*, 964 A.2d 1141, 1144 (R.I. 2009)). "Without making this determination, th[is] Court will not have jurisdiction to entertain the claim." *Id.*

"[W]ith respect to the ultimate decision by a [hearing] justice to grant or deny declaratory relief, our standard of review is deferential." *Bruce Brayman Builders, Inc. v. Lamphere*, 109 A.3d 395, 397 (R.I. 2015) (quoting *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I. 2009)). Even so, this discretion "is not absolute and is subject to appropriate appellate review." *Id.* (quoting *Sullivan v. Chafee*, 703 A.2d 748, 751 (R.I. 1997)). We review the hearing justice's decision to grant a

declaratory judgment "to determine whether the court abused its discretion, misinterpreted the applicable law, overlooked material facts, or otherwise exceeded its authority." *Gerald P. Zarrella Trust v. Town of Exeter*, 176 A.3d 467, 469 (R.I. 2018) (quoting *Cigarrilha v. City of Providence*, 64 A.3d 1208, 1212 (R.I. 2013)).

In his bench decision, the hearing justice began by noting that plaintiffs properly presented the Superior Court with "an actual case of controversy" because they "ha[d] suffered an injury as a result of Ms. Steliga's refusal to convey the property." The plaintiffs alleged in their complaint that the delay in the conveyance of the property led to emotional turmoil, adverse impact on plaintiffs' work productivity and success, and the incurrence of expenses, costs, and fees for alternative living space, among other harms. In her amended answer, Steliga denied all of plaintiffs' alleged harms, but admitted that the closing never occurred and that the trust remained in possession of the property at the time of the action. Given the presence of an actual case and controversy arising from Steliga's undisputed refusal to convey the property, the hearing justice proceeded to consider the substantive issue presented: the enforceability of the P&S.

Before the hearing justice, Steliga assailed the P&S's validity because she purportedly signed the document as an individual, not as trustee. Individually, Steliga had no authority to convey the property and, therefore, she argued, the P&S

- 24 -

was void from the start. In response, plaintiffs averred that this Court had already addressed and rejected this precise argument in *Yates*. *See Yates*, 761 A.2d at 680.

In *Yates*, this Court rejected the seller's argument that the purchase and sales agreement was invalid because she executed the document with her personal signature. *Yates*, 761 A.2d at 679, 680. We eschewed this reasoning and concluded that the seller had "clothed herself with the clear authority to convey [the] property * * *." *Id.* at 680. Therefore, we held, it would be "inequitable to allow the seller to employ the device of the [t]rust to escape the obligations of the agreement." *Id.* More precisely, our decision in *Yates* affirmed the trial justice's reformation of the contract under the doctrine of mutual mistake. *Id.* Determining that because "[the buyer] testified that she always believed that [the seller] had the authority to sell the property, and [the seller] herself conceded that, as trustee, she possessed this power[,]" we agreed with the trial justice that mutual mistake applied and negated the capacity issue. *Id.*

In opposing the motion for summary judgment, Steliga distinguished *Yates* on the grounds that no mutual mistake occurred here. The hearing justice also noted Steliga's assertion that plaintiffs "knew or should have known that the name on the seller's disclosure and agreement was incorrectly [her] name in her personal capacity * * *." After some debate between the parties as to whether *Yates* was on point, the hearing justice agreed with plaintiffs. The hearing justice determined that, as in

*Yates*, "Steliga clearly clothed herself with the clear authority to convey the property by conceding she had the power to convey the property." As a matter of law, he concluded, Steliga's personal signature did not invalidate the P&S even though the document did not explicitly indicate her role as trustee.

On appeal, Steliga reprises the capacity argument and implies that, unlike the buyer in *Yates*, plaintiffs failed to seek reformation of the P&S to correct Steliga's signature. The plaintiffs' knowledge that Steliga's signature "wasn't a signature of a [t]rustee[,]" Steliga argues, voided the P&S and potentially created an unmarketable and unassignable title to the property, which plaintiffs had a responsibility to relay to their mortgage lender.

In the face of these claims, plaintiffs maintain that Steliga had full capacity to convey the property under *Yates* and G.L. 1956 §§ 18-4-2(a)(2) (powers of trustees) and 18-4-4 (power of sale).

We agree with the hearing justice that *Yates* settles the question. Although reformation by mutual mistake brought *Yates* before this Court under a slightly different posture, the underlying reasoning there applies just as felicitously here. With particular attention, we note our observation in *Yates* that "it would be unfair and inequitable to allow the seller to employ the * * * [t]rust to escape [her] obligations * * *." *Yates*, 761 A.2d at 680 (brackets omitted).

By her own deposition testimony, Steliga admitted that she did not own the property individually and that the property was owned solely by the trust. She further clarified that she, as an individual, had no authority to sell the property. She affirmed that only the trust could sell the property and that she, as the trustee, controlled the trust. And finally, when asked what she believed she was agreeing to do when signing the P&S, Steliga responded, "Sell the property." With this understanding of her legal relationship to the property, Steliga signed the P&S in the space designated with her name.

We perceive that Steliga indeed cloaked herself with the authority to convey the property to plaintiffs. *See Yates*, 761 A.2d at 680. As a result, we agree with the hearing justice that Steliga was bound by the P&S to sell the property in her capacity as trustee of the trust. We affirm the grant of summary judgment on count one and the entry of a declaratory judgment effectuating the same.

The grant of summary judgment in favor of plaintiffs on both counts stands on appeal.

## B

### Specific Performance

We now turn to address the remedies that the hearing justice awarded after granting plaintiffs' motion for summary judgment. First, after the hearing justice concluded that Steliga had repudiated the P&S and that the P&S was valid, binding,

and enforceable, he granted plaintiffs' request for specific performance. For the reasons set forth below, we vacate the award of specific performance.

**Standard of Review**

"Specific performance is available as a remedy for breach of a real estate agreement when 'the essential contractual provisions are clear, definite, certain, and complete.'" *Terrapin Development, LLC v. Irene M. O'Malley Revocable Trust*, 253 A.3d 1241, 1246 (R.I. 2021) (brackets omitted) (quoting *Keystone Properties and Development, LLC v. Campo*, 989 A.2d 961, 964 (R.I. 2010)). "In the absence of a legitimate and articulable equitable defense, specific performance is an available remedy when a purchaser of real estate under a written contract demonstrates that he or she was at all times ready and willing to perform the contract." *Bucklin v. Morelli*, 912 A.2d 931, 936 (R.I. 2007).

The remedy of specific performance is not available "as a matter of right[,]" but rather "rests within the sound discretion of the [hearing] justice." *Fisher v. Applebaum*, 947 A.2d 248, 251 (R.I. 2008). "[T]his Court will not disturb a [hearing] justice's ruling on a specific performance claim unless the appellant demonstrates an abuse of discretion or error of law on the part of the [hearing] justice." *Lajayi v. Fafiyebi*, 860 A.2d 680, 686 (R.I. 2004) (quoting *Thompson*, 762 A.2d at 436). That said, "[t]hough we are mindful that our review is a deferential one, it 'cannot be equated with no review at all.'" *Sloat v. City of Newport ex rel.*

*Sitrin*, 19 A.3d 1217, 1224 (R.I. 2011) (quoting *Pleasant Management, LLC v. Carrasco*, 870 A.2d 443, 445 (R.I. 2005)).

**Analysis**

On appeal, Steliga appears to argue (1) that plaintiffs were not at all times ready, willing, and able buyers; and (2) that the principles of equity barred plaintiffs from relief by specific performance. To be sure, Steliga's presentation of the specific performance issue is allusive, at best.[6] However, her written submissions indicate sufficiently her view that plaintiffs were not entitled to recover by an equitable remedy, in this case specific performance. Thus, we are well within our purview to address the remedy on appeal.[7]

---

[6] It is somewhat challenging to decipher Steliga's 12A statement. As our dissenting colleague correctly suggests, at no point in her 12A statement does she explicitly dispute the specific performance order. She does, however, inartfully advance equitable defenses, e.g., that it was "bad faith" and "unfair renegotiation" for plaintiffs to propose "open-ended and costly repairs" that the parties "never agreed" upon. Additionally, she asserts that the cancellation of her contract on the Seekonk property in reliance on plaintiffs' actions caused her "equitable detriment." She also specifically refutes the hearing justice's finding that plaintiffs "at all times had been ready, willing, and able to perform their part of the agreement[,]" which is the *sine qua non* of specific performance.

[7] It is not a novel practice for this Court to delineate between the judgment as a matter of law and its associated remedy. *See, e.g.*, *Bashforth v. Zampini*, 576 A.2d 1197, 1199 (R.I. 1990) ("It has always been the practice to permit a defendant to be heard on the assessment of damages in a defaulted case.") (quoting *Johnson v. Hoxsie*, 19 R.I. 703, 703, 36 A. 720, 720 (1897)).

Here, despite having prevailed on their motion for summary judgment as a matter of law, plaintiffs nevertheless bear the burden to establish their right to recover in equity by specific performance. *See Citrone v. SNJ Associates*, 682 A.2d 92, 97 (R.I. 1996); 25 Williston on Contracts § 67:18 (4th ed. May 2023 update)

- 29 -

Specific performance is an extraordinary equitable remedy. *See* 25 Williston on Contracts § 67:1 (4th ed. May 2023 update).  As a remedy in equity, specific performance aims to deliver perfect justice. *See id.*; *Yates*, 761 A.2d at 679 (noting that "specific performance is appropriate when adequate compensation cannot be achieved through money damages").  To remedy the breach or repudiation of a contract to sell real estate, specific performance is appropriate because monetary damages cannot adequately compensate for the peculiar value of land. *See Jolicoeur Furniture Co., Inc. v. Baldelli*, 653 A.2d 740, 749 (R.I. 1995) ("[B]ecause land is 'unique and distinctive,' adequate compensation cannot be achieved through monetary damages, and an award of specific performance is an appropriate remedy in the breach of a contract for the sale of land." (quoting *Griffin*, 570 A.2d at 661-62)).

Generally, where a contract for the sale of land is valid and enforceable, specific performance should be awarded as a matter of course. *See* 71 Am. Jur. 2d *Specific Performance* § 129 (May 2023 update) ("Specific performance should generally be granted as a matter of course or right regarding a contract for the sale

---

("[A] litigant seeking the remedy of specific performance is held to a higher standard than one seeking merely money damages * * *."); *cf. Webster v. Perrotta*, 774 A.2d 68, 76-77 (R.I. 2001) ("It is the law in this state that 'although the factual allegations of a complaint will be taken as true upon default, those allegations relating to the amount of damages suffered generally are not.'") (brackets omitted) (quoting *Bashforth*, 576 A.2d at 1200).

of real estate where a valid, binding contract exists * * *."). However, it is well settled that there is no right to specific performance, even if the contract in question concerns real property. *See Fisher*, 947 A.2d at 251 ("A party is not entitled to specific performance of a contract for the sale of land as a matter of right."); *see also* 81A C.J.S. *Specific Performance* § 57 (Apr. 2023 update) ("Where an interest in real property is the subject matter of the agreement, the courts generally have jurisdiction to enforce specific performance * * * but specific performance will not be granted where it would be unjust, oppressive, or otherwise inequitable to do so.").

The decision to grant or deny specific performance rests within the sound discretion of a trial justice. *See Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1269 (R.I. 1989); *Fracassa v. Doris* (*Fracassa II*), 876 A.2d 506, 509 (R.I. 2005). To be sure, this discretion is considerably circumscribed when a trial justice enforces a valid contract for the sale of land. *See Crafts v. Pitts*, 162 P.3d 382, 389 (Wash. 2007) ("While a decree of specific performance rests within the sound discretion of the trial court, this does not permit a court to deny specific performance when otherwise appropriate.").

Nevertheless, a trial justice may exercise discretion to withhold specific performance where principles of equity militate against its award, including in the context of land. *See Webster Trust v. Roly*, 802 A.2d 795, 798 (Conn. 2002) ("The granting of specific performance of a contract to sell land is a remedy which rests in

- 31 -

the broad discretion of the trial court depending on all of the facts and circumstances when viewed in the light of the settled principles of equity * * *." (citation omitted)); *Colony Park Associates v. Gall*, 572 A.2d 891, 894 (Vt. 1990) ("Although specific performance of a contractual obligation follows almost as a matter of course from proof of its existence, there is provision for the exercise of a judicial discretion, based on considerations proper for equity's concern."); *Anderson v. Onsager*, 455 N.W.2d 885, 889 (Wis. 1990) (eschewing the notion that a "total abnegation of a trial court's discretion" occurs when the contract is for a sale of land); *see also May v. Midwest Refining Co.*, 121 F.2d 431, 438 (1st Cir. 1941) ("There is ample authority to support the proposition that a court of equity has the power to refuse a decree of specific performance solely on the ground that to give such relief would result in great injustice to one party in comparison to the value of the performance to the other."). Before awarding specific performance, a trial justice should view the specific facts and circumstances of each case through the prism of equity by weighing several factors, including the sufficiency of the consideration, the mutuality of the obligation, whether specific performance would impose a hardship on one party that outweighs the benefits to the other, whether the remedy would place an undue hardship on a third party, whether either party acted with unclean hands or bad faith, and whether specific performance is impossible or otherwise unconscionable. *See, e.g., Morningstar v. Robison*, 527 P.3d 241, 247-48 (Wyo. 2023) (stipulating

that "a buyer does not have an absolute right to specific performance" and listing "several factors the district court should consider when deciding whether to award specific performance"); *Colony Park Associates*, 572 A.2d at 894-95; *see also Citrone v. SNJ Associates*, 682 A.2d 92, 96 (R.I. 1996) (holding that, in an equity proceeding, "matters which cause hardship or injustice to either of the parties are certainly facts that should * * * be considered by a trial justice in deciding whether to exercise his or her discretion in granting specific performance").

The hearing justice's bench decision was bereft of any weighing, balancing, or even acknowledgment of such equitable considerations. *See Fracassa II*, 876 A.2d at 509 (holding that the trial justice abused his discretion by denying specific performance in *Fracassa v. Doris* (*Fracassa I*), 814 A.2d 357 (R.I. 2003)—his initial decision reviewed by this Court—"without making specific factual findings demonstrating how [the] plaintiff failed to meet his burden of proof"); *Bucklin*, 912 A.2d at 937 (upholding a grant of specific performance because, after finding specific performance was an available remedy, the trial justice "specifically addressed and rejected" the defendant's equitable defenses). Here, after concluding that the P&S was valid, binding, and enforceable as a matter of law, the hearing justice stated conclusively that a remedy in equity through specific performance should be granted, as though one begets the other. We disagree.

Our jurisprudence in the realm of specific performance reveals that amorphous considerations of fairness are germane to decisions issued by a court sitting in its equitable jurisdiction. *See, e.g.*, *Citrone*, 682 A.2d at 95-96 ("Although * * * a contract should not be set aside merely because following its execution performance becomes more difficult or expensive than anticipated * * * matters which cause hardship or injustice to either of the parties are certainly facts that should, in an equity proceeding, be considered * * *."); *Eastern Motor Inns, Inc.*, 565 A.2d at 1271 ("[E]quity abhors a forfeiture, * * * equity also abhors bad faith and dilatory action * * *."); *Shiller v. Gemma*, 106 R.I. 163, 165, 256 A.2d 487, 489 (1969) (noting, generally, that the "plaintiffs' original complaint was addressed to the equitable jurisdiction of the [S]uperior [C]ourt in that it sought specific performance of a contract for the sale of real property"). After reviewing our precedents in this rather esoteric area of law, we perceive that the record here was insufficiently developed for such an extraordinary remedy to have been granted at summary judgment.[8] *See Nogueras v. Ling*, 713 A.2d 214, 217 (R.I. 1998) (reasoning that a bevy of disputed facts in the record regarding "whether, when, and in what manner either side contacted the other or otherwise acted in good faith in

---

[8] Indeed, this Court has upheld orders for specific performance of real estate contracts, granted on summary judgment, but typically where the validity of the underlying agreements was never in dispute. *See, e.g.*, *Greensleeves, Inc. v. Smiley*, 942 A.2d 284, 287 (R.I. 2007); *Melrose Enterprises, Inc. v. Pawtucket Form Construction Co.*, 550 A.2d 300, 300-01 (R.I. 1988).

attempting to schedule a closing date" presented "a classic factual dispute that should not be resolved on summary judgment"). *But see Lajayi*, 860 A.2d at 688 (upholding a grant of specific performance where the buyers' extensive efforts to effectuate the closing were uncontradicted in the record).

Steliga levied multiple equity-based arguments before the hearing justice and raised them again before this Court on appeal. She argues that plaintiffs engaged in bad faith negotiation tactics regarding the repairs price and that Steliga relied, presumably reasonably, on plaintiffs' statement about walking away when she canceled her contract on the Seekonk property. Although the facts underpinning these claims may have been immaterial for the purposes of the summary judgment motion, they carry weight in the balance of equities. *See, e.g.*, *Morningstar*, 527 P.3d at 247 (listing "whether either party has unclean hands or engaged in bad faith" as one of the equitable factors that may weigh against specific performance); *Fazzio v. Mason*, 249 P.3d 390, 395 (Idaho 2011) (recognizing that "the defendant's subjective ability to comply with the award of specific performance is a relevant equitable factor to be considered"). At minimum, the hearing justice should have engaged with these equitable considerations before granting specific performance. *See Bucklin*, 912 A.2d at 937. Instead, the hearing justice treated the legal claim for declaratory judgment and equitable remedy for specific performance analytically as one, which they are not. *See* 71 Am. Jur. 2d *Specific Performance* § 7 (May 2023

update) ("Because the granting of specific performance is controlled by the established principles and rules constituting the body of equity jurisprudence, equitable relief by way of specific performance does not follow as a matter of course merely by establishing the existence and validity of the contract involved * * *."); *cf. Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996) ("[T]he granting of specific performance is an equitable remedy that can be withheld by the trial justice for equitable reasons even when * * * one of the parties can establish that a breach of contract has occurred."); *Loose v. Brubacher*, 549 P.2d 991, 998 (Kan. 1976) (concluding that, even though the plaintiffs had legally exercised their option to purchase land, that did "not mean [they were] entitled to specific performance as a matter of law").

On appeal, we are left with Steliga's various allegations that plaintiffs acted unfairly, unreasonably, and in bad faith. These assertions not only sound in equity, but they also probe at disputed facts in the record, which this Court can neither ignore nor resolve. *See Empire Acquisition Group, LLC v. Atlantic Mortgage Company, Inc.*, 35 A.3d 878, 884 (R.I. 2012) ("Generally, the determination of whether a party's conduct is reasonable under the facts and circumstances of the case is a question of fact, which ordinarily cannot be disposed of by summary judgment."); *Nogueras*, 713 A.2d at 217 (remanding the case back to the Superior Court where the record contained numerous factual inconsistencies).

Indeed, specific performance should be granted in nearly every case where there is a valid contract for the sale of land, but the award is not compulsory. *See* 71 Am. Jur. 2d *Specific Performance* § 130 (May 2023 update) ("Specific performance should generally be granted as a matter of course * * * regarding a contract for the sale of real estate * * *. However, there is no right to specific performance, but rather, the granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all the facts and circumstances when viewed in the light of the settled principles of equity."). Here, the record is replete with miscommunications between the parties that could be relevant to the award of specific performance. As such, we cannot uphold the hearing justice's decree for specific performance without engaging in inappropriate factfinding.

We also acknowledge this case's current posture at summary judgment and are mindful that the remaining counts from plaintiffs' complaint await resolution in the Superior Court. Given these unresolved claims, the hearing justice's grant of specific performance appears to have been, at the very least, premature.

For the foregoing reasons, we vacate the award of specific performance.

# C

## Attorneys' Fees

Finally, we address the matter of attorneys' fees. Steliga did not explicitly dispute the hearing justice's award of attorneys' fees in her appeal to this Court. However, we perceive that Steliga raised justiciable issues of fact that impel us to reverse the award of attorneys' fees.

## Standard of Review

"This Court has 'staunchly adhered to the American rule that requires each litigant to pay its own attorney's fees absent statutory authority or contractual liability.'" *Danforth v. More*, 129 A.3d 63, 72 (R.I. 2016) (brackets omitted) (quoting *Shine v. Moreau*, 119 A.3d 1, 8 (R.I. 2015)). Although we have recognized that "[t]he issue of whether there exists a *basis* for awarding attorneys' fees generally is legal in nature * * * [and reviewed] *de novo*[,]" if "there is an adequate legal basis for such an award, then we review a [hearing] justice's decision awarding or denying attorneys' fees for an abuse of discretion." *Arnold v. Arnold*, 187 A.3d 299, 315-16 (R.I. 2018) (quoting *Danforth*, 129 A.3d at 72).

## Analysis

The parties do not dispute the legal basis for attorneys' fees under § 9-1-45 and, indeed, the civil action in this case arose from a breach of contract claim.

Acknowledging that a proper legal basis exists for attorneys' fees under § 9-1-45, we proceed. *See Arnold*, 187 A.3d at 315-16.

Section 9-1-45 states:

> "The court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court:

> "(1) Finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party; or

> "(2) Renders a default judgment against the losing party."

We first note that at the hearing on the motion for summary judgment, the hearing justice enunciated the proviso of subsection (1), according to the transcript, as:

> "(1) Finds that there was a complete absence of a justifiable issue of either law or fact raised by the losing party[.]"

We are at a loss to determine whether the word "justifiable" was a slip of the tongue, a misunderstanding of the statutory language, or, most likely, simply a scrivener's error. In any event, it gives us pause as to whether the appropriate standard was applied.

More significantly, however, after reading the statute, the hearing justice concluded,

> "Based on the above analysis, this [c]ourt should find and does find that Ms. Steliga has breached the agreement by

refusing to convey the property and anticipatorily repudiating the agreement. Thus, if this [c]ourt grants buyers' motion, this [c]ourt should grant attorneys' fees in an amount this [c]ourt deems reasonable."

We perceive that the hearing justice missed a step in the analysis. This Court has consistently held that, even where a party proves unsuccessful on the merits, justiciable issues may yet exist. *See, e.g.*, *Arnold*, 187 A.3d at 316 ("[T]he trial justice found that, even though the plaintiffs did not prevail, there was a justiciable issue * * *. We can see no abuse of discretion in the trial justice's ruling, and thus decline to disturb it."); *Danforth*, 129 A.3d at 72 (holding that "even though [the hearing justice] ultimately concluded that [the defendants'] arguments * * * were meritless" there nevertheless remained "justiciable issues" over the inspection contingency in the purchase and sales agreement); *UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corporation*, 641 A.2d 75, 80 (R.I. 1994) ("We are of the opinion that the question of whether the statute of frauds was satisfied presented a justiciable issue even though the evidence eventually proved to be legally deficient.").

The impotence of Steliga's legal arguments do not erase the justiciable issues of fact she raised in response to the plaintiffs' motion for summary judgment. For example, her allegation that the repair addendum was unfairly "open-ended" seems valid in light of Bass's admission that the repair costs and negotiations were never resolved. This and other unresolved facts discussed herein militate against the

- 40 -

notion that there was a "*complete absence* of a justiciable issue of * * * fact[.]" Section 9-1-45 (emphasis added). We conclude, therefore, that the hearing justice's tacit determination that Steliga failed to introduce any justiciable issues of law or fact constituted an abuse of his discretion. Such factual issues were, in fact, present and sufficient to bar any award of attorneys' fees under § 9-1-45. Accordingly, we vacate the award of attorneys' fees.

## IV

### Conclusion

For the foregoing reasons, the judgment of the Superior Court in favor of the plaintiffs as to count one (declaratory judgment) and count three (anticipatory repudiation) of the plaintiffs' complaint is affirmed, but the grants of specific performance and attorneys' fees are vacated. The papers may be remanded to that tribunal for resolution of all such matters as may remain pending in the case. In addition, the Superior Court is directed to hold an evidentiary hearing and make findings of fact with respect to the equitable factors relevant to the plaintiffs' request for specific performance.

Justice Lynch Prata did not participate.

- 41 -

**Justice Robinson, concurring in part and dissenting in part.** I am pleased to be able to wholeheartedly concur in the Court's analysis concerning the plain meaning and enforceability of the written Purchase and Sales agreement and concerning the issue of anticipatory repudiation.[1] I also concur in the Court's discussion of the attorneys' fees issue and in its decision to vacate the award of attorneys' fees under G.L. 1956 § 9-1-45. However, I feel that I must respectfully dissent in the strongest possible terms from the fact that the majority has chosen to address the issue of specific performance.[2] That is an issue which is not by any stretch of the imagination properly before us; and, in my considered judgment, the Court is opening a totally unnecessary Pandora's box by *sua sponte* inviting the trial court to revisit that issue. I am unable to recall ever having disagreed so unreservedly about a matter before this Court. My respect for this institution and for

---

[1] This Court unanimously affirmed the finding of anticipatory repudiation in no uncertain terms, stating: "*[W]e affirm the hearing justice's conclusion that Steliga repudiated the P&S as a matter of law.*" (Emphasis added.)

 If there is to be a balancing of equities upon remand, as is called for in the "Specific Performance" section of the Court's opinion, Steliga's anticipatory repudiation of the P&S will hopefully have a weighty role to play in that balancing process.

[2] I write this partial dissent almost regretfully—because, although the rest of the opinion strikes me as being both correct and cogent, I am at the same time absolutely convinced that the foray into the specific performance issue is so very unnecessary. I have given some thought to saying nothing about that foray, but I feel obliged to express my reaction to what I consider to be an unwise deviation from certain settled procedural and substantive norms.

the author of the Court's opinion is very great, but I nonetheless feel compelled to voice my conviction that the Court is unwisely and for no good reason diverging from our normal tradition regarding what is grist for the appellate mill. I fear that what the Court is doing by opting to address the issue of specific performance in this case will have unfortunate consequences in the future.

The defendants' statement filed pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure speaks for itself. It focuses on arguments as to why the purchase and sales agreement issue should not be strictly construed according to its terms—arguments that this Court has resoundingly and unanimously rejected.[3] At no point does defendants' Rule 12A statement challenge the fact that, after concluding that the purchase and sales contract is valid and after finding anticipatory repudiation on Steliga's part, the Superior Court ordered specific performance. For that reason, I am profoundly convinced that our venerable raise or waive principles should apply. In plain English, I think that, by reaching out

---

[3] I am perplexed by the fact that, at the conclusion of its analysis of the important issue of anticipatory repudiation, the majority opinion unequivocally states that "we affirm the hearing justice's conclusion that Steliga repudiated the P&S as a matter of law"—and then chooses to remand the case for the trial justice to deal with the specific performance issue, even though defendants have not raised that issue meaningfully or clearly in their Rule 12A statement. In my judgment, the majority should have simply said "Enough is enough" once it unequivocally affirmed the hearing justice's conclusion that "Steliga repudiated the P&S as a matter of law."

- 43 -

to address an issue that has not been raised by defendants, this Court is radically and regrettably departing from our usual practice. *See, e.g.*, *Providence Journal Company v. Convention Center Authority*, 824 A.2d 1246, 1248 (R.I. 2003) ("Under the general principles of the adversary system, a party should not be granted relief that it did not request."); *Estate of Meller v. Adolf Meller Co.*, 554 A.2d 648, 654 (R.I. 1989) ("[I]t is not inappropriate for us to expect, and indeed to demand that the briefs before us will contain all the arguments that the parties wish us to consider * * *."); *see also Giammarco v. Giammarco*, 151 A.3d 1220, 1222 (R.I. 2017) (noting that "Rule 12A(1) provides that the appellant * * * shall file a statement of the case and a summary of the issues proposed to be argued * * *") (internal quotation marks omitted); *McGarry v. Pielech*, 108 A.3d 998, 1004 (R.I. 2015) (stating that "this Court need only address issues presented to it * * *"); *cf. Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1170 (R.I. 2014) ("[W]e will not consider arguments that have been made by an *amicus curiae* but that were not advanced by a party.").[4]  I am completely unable to perceive any

---

[4]  Even if they had indicated in their Rule 12A statement that they were appealing from the order of specific performance (as they most certainly did not), defendants have not presented this Court with any meaningful argument in support of an appeal from that order (if it had been made).  When that happens, our precedent dictates that we should not reach such an inadequately briefed contention. *See, e.g.*, *Rhode Island Housing and Mortgage Finance Corporation v. Gordon*, 275 A.3d 559, 567 (R.I. 2022) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that

sufficient reason for such a departure from our traditional policy about waiver, and I fear that it will have unfortunate consequences in the future.

The contract law issue in this case has been nicely analyzed in the majority opinion, and that analysis is entirely consistent with this Court's frequently articulated jurisprudence in that area. *See, e.g.*, *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 746 (R.I. 2009) ("Unambiguous contract language * * * renders the parties' intent irrelevant."); *Gorman v. Gorman*, 883 A.2d 732, 739 n.11 (R.I. 2005) ("Under established contract law principles, when there is an unambiguous contract and no proof of duress or the like, the terms of the contract are to be applied as written."); *Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004) ("If the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written."); *F.D. McKendall Lumber Co. v. Kalian*, 425 A.2d 515, 518 (R.I. 1981) ("[A] party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its

---

issue.") (brackets omitted) (quoting *Dunn's Corners Fire District v. Westerly Ambulance Corps*, 184 A.3d 230, 235 (R.I. 2018)); *Manchester v. Pereira*, 926 A.2d 1005, 1015 n.8 (R.I. 2007) (referring to "our well established rule that we will not substantively address an issue that was not adequately briefed * * *"); *James J. O'Rourke, Inc. v. Industrial National Bank of R.I.*, 478 A.2d 195, 198 n.4 (R.I. 1984) ("Claims of error that are unsupported by either argument or citation of authority are entitled to no consideration on review.").

contents.").[5] *See generally Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained.").

I am frankly unable to understand why the majority feels it necessary to go beyond its impeccable discussion of the contract law issue and *sua sponte* opt to include in its opinion a discussion of the principles relating to the sometimes arcane and complex area of specific performance.[6] My inability to understand why the majority has chosen to venture into that arena is magnified by certain statements in the majority opinion. For example, the following paragraph from the "Travel" section of the majority opinion appears immediately after the summary of the trial justice's ruling concerning the anticipatory repudiation issue:

---

[5] In a frequently cited opinion, Judge Selya has commented as follows on the language from the *Kalian* case: "As Justice Cardozo observed some sixty years ago, one 'who omits to read takes the risk of the omission.' * * * Were it otherwise, signed contracts would be little more than scraps of paper, subject to the selective recollection of the parties in interest." *D'Antuono v. CCH Computax Systems, Inc.*, 570 F.Supp. 708, 714 (D.R.I. 1983) (quoting *Murray v. Cunard S.S. Co., Ltd.*, 235 N.Y. 162, 166, 139 N.E. 226, 228 (1923)).

[6] Since I do not believe that the issue of specific performance is properly before this Court, the wiser course of action would be for me to say absolutely nothing about that issue. And I have decided, albeit not without hesitation, to abide by that wiser course of action. However, it should not be inferred that I have no preliminary view about the equities which weigh in favor of the seller and those which weigh in favor of the buyers.

> "Next, addressing plaintiffs' request for specific performance, the hearing justice began by acknowledging that plaintiffs properly presented the Superior Court with an 'actual case of controversy' having suffered injury from Steliga's refusal to convey the property. Consequently, he determined that the Superior Court should enter a judgment that the P&S was valid and order specific performance of the P&S."

What the majority opinion fails to note in its narration of the travel of this case is the crucial fact that Steliga's counsel did not articulate in any meaningful way a legitimate equitable defense at that juncture—or, indeed, at any point. In view of that silence, I do not believe that the hearing justice was obliged to *sua sponte* engage in a weighing of the equities when he had before him a P&S which he found to be perfectly valid and enforceable. I do not think it advisable to expect trial justices to perform some sort of equitable weighing when none has been requested. *See Martins v. Bridgestone Americas Tire Operations, LLC*, 266 A.3d 753, 758 (R.I. 2022) ("Judges are not expected to be mindreaders.") (quoting *State v. Florez*, 138 A.3d 789, 798 n.10 (R.I. 2016)).

Later, at the beginning of its discussion of the specific performance issue, the majority opinion states (in language that can charitably best be described as an understatement): "To be sure, Steliga's presentation of the specific performance issue is allusive, at best." That sentence is accompanied by footnote six, which states in pertinent part: "It is somewhat challenging to decipher Steliga's 12A statement. * * * [A]t no point in her 12A statement does she explicitly dispute the specific

- 47 -

performance order." With all due respect, I must say that the majority's determination to spontaneously invoke specific performance considerations in the face of those sentences is completely irreconcilable with our normal appellate practice and procedure. I can find no precedent from this Court for not perceiving such utterly inadequate reference to a legal issue on appeal to be anything other than a waiver of that issue. The majority opinion is distressingly unclear as to precisely what is the interest of equity to which it refers. The majority opinion seeks to create a silk purse out of a sow's ear by asserting that Steliga's "written submissions indicate sufficiently her view that plaintiffs were not entitled to recover by an equitable remedy, in this case specific performance." However, the opinion fails to point out where or how Steliga made that argument "sufficiently" either in the Superior Court or on appeal. The plain blunt fact is that the parties were signatories to an unambiguous contract (*viz.*, the purchase and sales agreement).[7] The validity of that contract was upheld by the Superior Court, and that ruling is affirmed in the Court's opinion as is the hearing justice's specific finding of anticipatory repudiation on Steliga's part. It is now past time for that contract to be executed according to its

---

[7] *See Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island*, 18 A.3d 495, 498 (R.I. 2011) ("[W]e do not actually *construe* an unambiguous contract; we simply consider the dictates of the plain language in the contract.").

terms[8] without further time-consuming and costly litigation about specific performance—an issue about which defendants have chosen not to address in their Rule 12A statement.[9]

I am well aware that the tone of my partial dissent in this case is close to being perfervid, but I believe that it is necessary for me to emphasize how strongly I feel that the majority is significantly departing from one of the fundamental principles of our appellate jurisprudence; and it is departing from that principle without even having been invited by counsel for defendants to do so. It is with genuine regret that I predict that this otherwise obscure case will before long give rise to other litigation in other contexts, both civil and criminal. I am convinced that it is a major mistake for this Court to venture into the realm of the equitable remedy of specific performance without the parties having meaningfully identified that as an issue for

---

[8]     *See Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004) ("If the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written.").

[9]     Footnote seven of the majority opinion cites Rhode Island authority in support of the thesis that "[i]t is not a novel practice for this Court to delineate between the judgment as a matter of law and its associated remedy." That case is *Bashforth v. Zampini*, 576 A.2d 1197 (R.I. 1990). However, in actuality that case is irrelevant to the instant matter in that it deals with a default situation, where, by definition, the normal adversary process is absent. *See Bashforth*, 576 A.2d at 1199. Here, by contrast, both parties were at all times represented by counsel who were free to raise or not raise whatever arguments they deemed advisable.

our consideration on appeal.[10]  Further costly litigation will in all likelihood result—

and, worse, a basic principle of our appellate practice will have been disregarded.

Respectfully, but very ruefully, I dissent.

---

[10]     I find it necessary to quote once again the following candid statement from the body of the Court's opinion: "To be sure, Steliga's presentation of the specific performance issue is allusive, at best."  And footnote six which relates to that statement states in pertinent part: "[A]t no point in her 12A statement does [Steliga] explicitly dispute the specific performance order."  To my mind, it takes more than a presentation that is "allusive, at best" and that is lacking explicitness to bring an issue before this Court for appellate review.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Kevin Bennett et al. v. Angela Steliga, individually and personally and as Trustee of The Angela M. Steliga Living Trust dated January 14, 2013, et al. |
| **Case Number** | No. 2022-74-Appeal. (PC 20-7250) |
| **Date Opinion Filed** | September 12, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice R. David Cruise |
| **Attorney(s) on Appeal** | For Plaintiffs: Derek M. Gillis, Esq. |
| | For Defendants: Edward J. Mulligan, Esq. |